**Ana Natasha Cervantes M.D.**
**Forensic Psychiatry**
**465 Tiburon Ln**
**East Amherst, NY 14051**
**(443) 812-1865**
**ancervan1@yahoo.com**


**PRESENTENCE EVALUATION**


| | |
|---|---|
| **DEFENDANT:** | Brandon Kidder |
| **DATE OF BIRTH:** | 06/16/1984 (Age 37) |
| **REFERRAL SOURCE:** | Dominic Saraceno, Esq. |
| **CASE NUMBER:** | 20-MJ-1010 |
| **DATE OF EVALUATION:** | 08/27/2021 |

November 8**,** 2021

Dear Mr. Saraceno,

At your request, I evaluated your client, Mr. Brandon Kidder at the Cattaraugus County Jail on August 27, 2021.  The purpose of the evaluation was to provide information that might assist in your client's sentencing.

Prior to the evaluation, Mr. Kidder understood that I would be obtaining information from various sources and would be discussing my opinions with you.  He also understood that even though I was psychiatrist, there was no doctor-patient relationship for purposes of this evaluation.  I had previously briefly evaluated and treated Mr. Kidder when he was an inmate at the Niagara County Correctional Facility, where I am the only psychiatrist.  I discussed this prior relationship with both you and Mr. Kidder, and both of you agreed that you had no concerns about this prior interaction.

**SOURCES OF INFORMATION:**
1.  My interview with Mr. Brandon Kidder on August 27, 2021, for approximately 4½ hours, which included administration of the MMPI-2.
2.  Telephone interview with Mr. Jeremy Kidder, Mr. Kidder's older brother, for approximately 40 minutes on August 27, 2021.
3.  Telephone interview with Darlene Kidder, Mr. Kidder's mother, on September 3, 2021, for approximately 45 minutes.
4.  Criminal complaint, United States District Court for the Western District of New York, Randall E. Garver, Special Agent, Federal Bureau of Investigation, dated March 5, 2020.
5.  Plea agreement, James P. Kennedy, Jr., United States Attorney, Western District of New York, by Caitlin M. Higgins, Assistant United States Attorney, dated August ___ (blank in original), 2021.

KIDDER, Brandon                                                                    2
Pre-sentence Forensic Psychiatric Evaluation
November 8, 2021

6.  Forensic evaluation, United States Department of Justice, Federal Bureau of Prisons, Metropolitan Correctional Center, Robin Watkins, PHD, ABTT, dated October 13, 2020.
7.  Psychiatric records from the Niagara County Correctional Facility dated March 6, 2020 to March 17, 2020.
8.  Psychiatric and medical treatment records from Erie County Medical Center dated February 3-13, 2020.
9.  Psychiatric and medical treatment records from Cattaraugus County Jail, dated December 4, 2020 to April 22, 2021.
10. Psychiatric and Medical treatment records from Bureau of Prisons Health Services dated April 27, 2020 to September 1, 2020.
11. MMPI-2 scoring and interpretation, Alex Caldwell, PhD, dated August 27, 2021.

**IDENTIFYING INFORMATION:**

Mr. Kidder is a 37-year-old Caucasian male, with no prior legal history before this instant offense, who is charged with possessing and receiving child pornography, in violation of Title 18, Unites States Code, Sections 2252A (a) (5) (B), 2252A (b) (2), and 2252A (a) (2) (A).

According to the criminal complaint, agent Garver of the Federal Bureau of Investigation was assigned to work cases involving violent crimes against children, which targets individuals involved in online sexual exploitation of children.  According to the investigation, on January 20, 2020, an investigation was opened into address 1321 Sandridge Road, Apartment Right, Alden, New York 14004.  Information obtained was that there had been concerning internet activity, including use of the Tor software on the computer and a phone, used to download child pornography.  Kidder admitted to investigators that he obtained child pornography out of curiosity, but also masturbates to it.  The FBI seized two Samsung smart phones, a Thermaltake desktop computer, a Dell laptop computer, and an Attache thumb drive, and a PNY thumb drive.  The computers were submitted to the Western New York Regional Computer Forensics Laboratory for a full forensic exam, and the telephones were searched at the Child Exploitation Task Force office.

The investigation goes onto note that there were several videos found on the devices showing adults interacting sexually with minor children, some of which were infants and toddlers.

According to the proposed plea agreement, the factual basis for entering into the agreement would include the fact that on or about May 24, 2019, Mr. Kidder knowingly possessed images and videos of child pornography, which were stored on a cellular telephone and other electronic storage media, all of which were manufactured outside of New York State.  The defendant obtained these images and videos of child pornography by downloading the images from the internet, specifically on the Dark Web.  For example, the defendant visited and downloaded images from a dark website featuring "hurtcore" materials.  On January 28, 2020, the FBI executed a search warrant on the defendant's residence.  The defendant admitted he had been "messing around on the dark

KIDDER, Brandon                                                                                   3
Pre-sentence Forensic Psychiatric Evaluation
November 8, 2021

net" and that he downloaded the Tor software on his computer and phone to, among other things, download child pornography.

Forensic review revealed that the defendant possessed more than 600 images and videos of child pornography, including images that portrayed prepubescent minors, or minors who had not attained 12 years of age; and images that portrayed sadistic, masochistic, and other depictions of violence. The base level offense is 18, and in addition, there would be a two-level increase due to the offense involving a minor who has not attained the age of 12 years, a four-level increase due to the fact that the material portrayed sadistic, masochistic, or other depiction of violence, a two-level increase pursuant to the fact that the offense involved the use of a computer, and a five-level increase pursuant to the fact that the offense involved 600 or more images, making the adjusted offense level of conviction 31. At the time of the plea agreement, it was the understanding of the government that the defendant's criminal history category is 1. Given the offense level of 28 and criminal history category of 1, the defendant sentencing range would be a term of imprisonment of 78 to 97 months, a fine of $25,000 to $250,000 and a period of supervised release of five years to life.

## BACKGROUND INFORMATION
## FAMILY HISTORY:

Mr. Kidder's parents are both still alive. His parents divorced when Mr. Kidder was approximately 12 years old (in the fifth grade). His mother reported that she has a history of Posttraumatic stress disorder from childhood sexual abuse perpetrated upon her. She also reported a history of problematic alcohol use in the past, which started after one of her twin sons died from Sudden Infant Death Syndrome. Mr. Kidder has two younger brothers and a younger sister. Mr. Kidder is the oldest. His brother, Jessee, was the surviving twin. To his knowledge and to his mother's knowledge, there is no other history of psychiatric disorders in the family.

Mr. Kidder was born and raised in the Alden, New York area, but the family did move quite a bit when he was a child. According to his mother, there were no significant problems with Mr. Kidder's gestation, birth or early childhood health. There were no developmental delays, and Mrs. Kidder described Brandon as "one of the easiest and best kids to raise" However, she did describe him as a loner, something that she noticed when he was quite young, given that she did home daycare for years, and Brandon never expressed any interest in playing with other children in the house.

Mr. Kidder's father worked at a machine shop, and his mother did home daycare from approximately 1990 to the mid 2000s. They had split custody of the children after the divorce, and Mr. Kidder lived mostly with his father until the age of 18. According to Mr. Kidder, Child Protective Services did become involved with their family on a couple of occasions due to the fact that they were living in a low-income area. However, he denied any history of domestic violence, either witnessed or perpetrated toward him, or sexual violence.

KIDDER, Brandon                                                                  4
Pre-sentence Forensic Psychiatric Evaluation
November 8, 2021

According to his mother, he had no significant conduct disorder symptoms such as truancy, running away from home, fighting, cruelty to animals, use of weapons, fire setting, stealing, lying, coerced sexual activity, destruction of property, or arrests or police contact.  She described him as somebody who loved animals and was not violent whatsoever.  His mother described him as "such a good kid."  She stated that if she had to pick one of her children to be in trouble with the law, Mr. Kidder would have been the last one that she would have picked to become involved in any kind of criminal activity.
Mr. Kidder's grandfather did introduce him to weapons and hunting, but Mr. Kidder never really enjoyed hunting, although did become a gun aficionado and had several legally acquired guns in his possession throughout adulthood.

**EDUCATIONAL HISTORY:**
Mr. Kidder attended high school through the 11th grade.  He completed the 11th grade and started 12th grade, but quit secondary to "not fitting in at school."  He did obtain his GED right after leaving school and passed on his first try.  He believed that he repeated the seventh grade because the family moved around a lot during that year after his parents split up.  He lived in Florida for a brief period of time, prior to returning to New York.  He stated it would take a long time for him to do things at school, and believed that he may have been diagnosed with a "mild learning disability."  He not recall having formal Individualized Education Programs.  However, Mrs. Kidder stated that Brandon was labeled as "emotionally disturbed" around the 7th or 8th grade and was given an Individualized Education Plan at that time.  She stated that it was not so much for cognitive difficulties, but because of the some of the behaviors that were concerning to the school, including Brandon wearing white contact lenses, and dressing in a Goth look, including head-to-toe dark clothing and combat boots, reminiscent of Marilyn Manson.  He stated that he was also very withdrawn and did not have any close friends at school at that time.

**EMPLOYMENT HISTORY:**
After Mr. Kidder obtained his GED, he worked from the ages of 17 to 25 at Town & Country Restaurant, doing mostly dishwashing and other clean-up work.  Mr. Kidder states that he left his job at the age of 25 to make more money at Majestic Pools, where his brother had been working for several years.  He worked for Majestic Pools from the age of 25 to 30, doing mostly stockroom work.  According to his mother, there were some issues when he had to deal with the public, including the fact that Mr. Kidder would sometimes make insensitive remarks about other religions, or talk about Hitler and Nazi Germany.  Mr. Kidder, on the other hand, stated that there were no complaints about him and that he felt that he fit in and was well-liked in that setting.  Ultimately, Mr. Kidder quit this job at the age of 30 (around 2014), has been able to live off of an inheritance that he received from his grandfather and has not returned to work since.

**RELATIONSHIP HISTORY:**
Mr. Kidder is single and has never been married.  He stated that he has never been in a serious romantic relationship.  He recalled having a girlfriend when he was 16 years old, and this relationship lasted "for a few weeks, maybe a few months."  He stated that they

KIDDER, Brandon                                                                 5
Pre-sentence Forensic Psychiatric Evaluation
November 8, 2021

did not really "go out." They basically "held hands in the school hallway." She was 15 years old. The relationship never became sexual. Mr. Kidder states that he has never had any sexual partners, either male or female. He has no interest, stating that it is his goal to die a virgin because it is necessary for him to do this in order to defeat one of the seven deadly sins. He identifies as completely heterosexual. He does masturbate, although not excessively, and does indicate that the most sexually arousing images for him usually involve girls in their early teens. He denied any interest in paraphilic behaviors such as sadism, masochism, bestiality, exhibitionism or voyeurism. He has no children.

With regard to other relationships, he has socialized with his brother and his brother's friends but does not have any close friendships. He had two roommates at the time of his arrest but did not really consider them close friends. He stated that he preferred to engage with people online and stated that he would spend up to half of his day (8 hours) playing massive multiplayer video games with other people around the world and has been doing so for years.

**LIVING SITUATION:**
Prior to his arrest, Mr. Kidder was living in a duplex owned by his brother, Jeremy. He stated that rent and utilities were only $200, so he was able to afford this from his modest savings, without having to obtain a job. He has never applied for nor received any kind of government entitlements.

**RELIGIOUS HISTORY:**
Mr. Kidder was raised Christian and stated that his family could be described as "strict" with regard to religion. Mrs. Kidder stated that Brandon was raised Christian, but she did not consider his upbringing particularly strict. She stated that Mr. Kidder's attitude toward religion changed significantly in his mid 20s, and he became more obsessed with readings from the Bible, and more recently, the Quran, to the point where he was memorizing and quoting entire passages and Bible verses, which was very different from his premorbid personality before his mid-20s.

**SUBSTANCE USE HISTORY:**
Mr. Kidder denied any past history of alcohol or substance use and his mother confirmed that she had no concerns that he ever used drugs or alcohol.

**LEGAL HISTORY:**
Other than the instant offense, Mr. Kidder has no prior legal history and no prior arrests. He is currently incarcerated at the Cattaraugus County Jail. He has had no problems in that facility. Prior to his transfer to Cattaraugus County, he had apparently been in several federal detention facilities, with the longest time being spent at the Metropolitan Correctional Center in Chicago, Illinois. There, he stated that he was placed in "the box" there due to being threatened by another inmate. He stated that his cellmate made up an excuse to get him removed from general population. He believes that this happened around June of 2020, and he spent five days in segregation, which he described was "more of for protective custody."

KIDDER, Brandon                                                                                    6
Pre-sentence Forensic Psychiatric Evaluation
November 8, 2021

**MEDICAL HISTORY:**
Mr. Kidder does not take any current medications for medical conditions, but stated that he has been told he has mild mitral valve prolapse. Mr. Kidder does not have any history of traumatic brain injuries and has not had any surgeries or other major health concerns.

**CURRENT MEDICATIONS:**
At the time I saw him at the Cattaraugus County Jail, Mr. Kidder was prescribed olanzapine (an antipsychotic) 5 mg at night, and hydroxyzine (an antianxiety medication) 25 mg three times a day. He reported being compliant with his medications but denied that they made him feel any different than his baseline when he is not on medication.

**PAST PSYCHIATRIC HISTORY:**
Mr. Kidder denied any past psychiatric treatment prior to his admission to Erie County Medical Center in February of 2020. He stated that his parents thought that there was something wrong with him "for years" prior to this, but he had never been in any kind of treatment or received any kind of evaluation. He stated that when the FBI came to his house related to the investigation surrounding his current charges, his parents "freaked out", went to speak with a lawyer and immediately took him to Erie County Medical Center after meeting with the lawyer. He was in the hospital for ten days.
Mr. Kidder is aware that he has been diagnosed with schizophrenia but does not agree with this diagnosis. He stated that when he was in Chicago at the Metropolitan Correctional Facility, he was told that he did not have schizophrenia and was not treated with any antipsychotics there. Upon his return to Cattaraugus County Jail, he stated that his mother encouraged him to take medication, but that he believes there is "little difference" when he takes the medication compared to when he does not. He believes that the only problem with him is that it takes him a little bit longer to do things due to having a learning disability.

With regard to religion (and likely related to his first onset of psychiatric symptoms), he stated that he had a very intense experience around the age of 25 when he saw a very large ball of light flashing across the sky. He stated that as a kid, he went from "god doesn't exist" and then becoming very interested in the Bible in his mid-20s. He then proceeded to "Revelation 14:4" again and described that he believed that if he is able to defeat the seven deadly sins and he is able to die a virgin that his sins will be forgiven. He also stated that all religions were connected and that although he identifies as Christian, he basically "believes in all of them." He stated, "I just have to die a virgin, I think that has already been predetermined." He also stated that he believes that extraterrestrials are already among human beings and are able to speak to them through people and through the media. He believes that all music is created as influence by extraterrestrials and that extraterrestrials can be both angels and demons. He stated that if people realized that all of this was going on around them it would "freak them out." He believed that these extraterrestrials influence a lot more than people want to think they do, but at the same time he is hesitant to talk about these things because "the first rule of Fight Club is that you don't talk about Fight Club." He stated that he believes that he is being "tested" and that he is "following the lamb…he who overcomes will inherit this

earth."  He believed God does speak to him, and although he does not describe it as an actual voice, he states, "It is almost like a download."  He also stated that he believes that he is "the life" but that he is constantly fighting temptation.  He recalled believing that he was the archangel, Michael, when he was at ECMC, but denied believing this at the time I evaluated him.  He states he is "completely different" although was not able to explain in what way.

**Records from Erie County Medical Center.**
The discharge summary from Erie County Medical Center indicated that he was admitted on February 3, 2020.  The intake notes indicated that he came in "in a state of acute psychosis, disorganized, and very delusional."  They noted that he had stockpiled an arsenal of loaded assault rifles (including an AK-47) and that he needed them to fight off zombies.

His parents have told the ECMC staff that he had begun describing an alien presence when he was in his mid 20s, and that the belief had progressed to him believing that he (Mr. Kidder) was a supreme being with powers over others.  He would often talk about Jesus and Allah in a tangential rambling in disorganized manner.  He also told staff that he had been visited by beings from another world many years ago.  He told staff that "It looked like a ball of light.  It hovered around Jerusalem."  He eventually believed that extraterrestrials could control human beings and could place suggestions into people's minds who were around him.  He also stated that he believed that he was a divine being, on an archangel level who would be "the judge of all souls."  He also reported hearing an unfamiliar voice several years ago saying, "please forgive me."  He also reported being "incensed that the FBI broke in and pointed guns at him.  You can't do that to a being of my level.  They are in big trouble.  I am a very high level being and that's unacceptable."

Mr. Kidder was started on olanzapine and later risperidone and was discharged on risperidone 3 mg at night.

**Psychiatric records from Niagara County Jail**
Mr. Kidder was initially evaluated by a social worker, Tammy Kling, on March 7, 2020.  She noted that Mr. Kidder had been started on risperidone (an antipsychotic) at Erie County Medical Center.  She noted that he appeared anxious and near tears during the evaluation.  I evaluated him on March 11, 2020.  At that time, he was prescribed 2 mg of Risperdal at night, but had requested to lower his dose to 1 mg at night due to feeling like it caused "sinus congestion."  He told me that his first contact with mental health had been at Erie County Medical Center where he was admitted on February 5, 2020.  He told me that he believed he was an extra dimensional being, because he had defeated the seven deadly sins.  He believed that he was a "superior being", and because of that he conquered them, that he overcame them.  He stated that he has felt like this "all his life." He stated that his parents believed that he started having delusions when he was 25 years old, because that is when he started "hearing and seeing things."  When asked for examples, he stated that he heard a woman scream "please forgive me" and also saw a ball of light outside of his window which he believed could have been his spacecraft

KIDDER, Brandon                                                                          8
Pre-sentence Forensic Psychiatric Evaluation
November 8, 2021

because he is extra dimensional.  He stated that he had some difficulty sleeping, was shaking a lot, and recently had been having chest pain.  He stated that he had seen a prescriber in Pembroke who reduced his risperidone dose he had been given at Erie County Medical Center from 3 mg at night to 2 mg at night, but that he still felt very shaky and restless.  He denied any history of suicide attempts or self-harm in the past.  On mental status exam, I noted that his affect was somewhat anxious and apprehensive.  He described his mood as anxious.  There was some mild shaking and tongue protrusion which he seemed to be unaware of.  He had evidence of significant delusions, both paranoid and grandiose.  He stated that he was very religious at baseline, and often reverted back to talking about defeating the seven deadly sins.  He stated that he had to quit his job cleaning pools because he could not deal with some of the customers and other workers mostly because of their "sin of greed."  He stated that he has never been in a romantic relationship and that he had to diverge in order to overcome the deadly sin of lust.  He was somewhat concrete and had what I thought was a somewhat schizoid personality presentation.  He denied any suicidal ideation, passive death wish, plan, or intent to engage in self-injury, and he appeared appropriately concerned about his legal situation.

At that time, without the benefit of records or additional collateral, my diagnosis was schizophrenia, possible schizotypal personality disorder, and akathisia (a side effect causing extreme inner restlessness and urge to move related to risperidone) in addition to situational anxiety related to his legal situation.  He was maintained in the infirmary to monitor for symptoms and side effects in the context of changing his antipsychotic due to side effects.  I discontinued risperidone and started him on a different antipsychotic, olanzapine (also known as Zyprexa) 5 mg at night and discussed the possibility of a different antipsychotic if side effects persisted.  I also started a medicine for anxiety, which he agreed to, so he was started on hydroxyzine (Vistaril) 50 mg three times a day as needed.  Mr. Kidder was released from the facility shortly thereafter, so he was never seen for followup there.

**Forensic evaluation, US Department of Justice, Federal Bureau of Prisons.**
The competency evaluation submitted by Dr. Robin Watkins was reviewed.  According to his evaluation, Mr. Kidder stated that he had a lot of friends in his youth (something that was in contrast to what his mother reported and what he reported to me when I interviewed him).  That evaluation also noted that he listened to Marilyn Manson and the band Cradle of Filth, and "gothic stuff" and he shaved his head, eyebrows, and face at one point.  He also told the evaluator he used to wear white contact lenses and "Marilyn Manson spikes."  He stated there were lot of people like him and that he loved "coats and guns."  He also stated that as an adult, he tended to play video games with friends online rather than in-person.

He described himself as a gun collector, that he had "quite an arsenal" (he told me that he only had four guns at the time of this arrest) and told the BOP evaluator he had over 4000 rounds of ammunition, but that he could never shoot an animal or person because it is a sin.  In that evaluation, it is also noted there was no available information to suggest a

KIDDER, Brandon                                                                9
Pre-sentence Forensic Psychiatric Evaluation
November 8, 2021

history of drug or alcohol abuse.  That evaluation also noted that he had no history of
mental health treatment or diagnosis until late January/February of 2020.  This was when
he was at Erie County Medical Center for nine days and first diagnosed with
schizophrenia.  He stated that he had developed some side effects such as restless legs
and numbness in his leg and chest pain.  The evaluation stated that the medications were
ultimately discontinued by a doctor at a correctional facility in Ohio, who advised him he
"shouldn't be taking them unless he absolutely needed it."  Mr. Kidder believed that he
received his diagnosis because he was religious, and believed that he was a saint, a higher
level being, like Saint Michael.  He also told the evaluator he defeated the seven deadly
sins and was following the 10 commandments.  He expressed awareness that his beliefs
were seen by others as "wacky" or "crazy" adding that he was religious and that he knows
that some of the things he was saying were "off the wall."  However, he explained that
the Bible says that when people die, they become an angel or a demon.  He believed that
he will be an archangel because he conquered the seven deadly sins and that if he dies a
virgin, that will cancel out any past misdeeds.  On several occasions, Mr. Kidder quoted
Revelation 14:4, stating, "Those who have not defiled themselves, those who are virgins,
and their mouth, no lie was found, and they are blameless in the eyes of the Lord."  When
asked by the evaluator if he believed that he was an angel now, or whether he will
become one after death, he responded "I believe I am being tested."  Mr. Kidder denied
any past or current hallucinations during that evaluation.  With regard to the events
leading to the arrest, he stated, "This is the first time I have done something wrong in 36
years, the first mistake of my life."  Although treatment records from ECMC and Niagara
County Jail were not obtained by them, the MCC records reference a note from
Pembroke Family Medicine, where Mr. Kidder saw a nurse practitioner, Thomas Finn,
who prescribed risperidone 2 mg at bedtime, and trazodone (sleep medication) 50 mg at
night if needed

Mr. Kidder arrived at MCC Chicago on May 8, 2020.  He stated that he had been
diagnosed with schizophrenia and no longer had any of the beliefs that led to that
diagnosis.  He denied any history of mental health problems and stated that he did not
experience any benefit from the medications.   Initially, it was suggested that his
presentation was an attempt to malinger mental illness.  He was placed on a 14-day
quarantine unit on arrival due to COVID-19 protocols.  He was then transferred to
general population.  Mr. Kidder asserted that he needed protective custody on May 29,
2020.  Mr. Kidder made vague statements about people in his cell (not his roommate)
trying to attack him, and he was transferred to the segregated housing unit (SHU).

He was seen by a psychologist on June 1, 2020, for protective custody review.  He was
noted not to have reported present mental health complaints.  He stated that hydroxyzine
had been prescribed for anxiety and that this was helpful.  He provided no specific details
regarding his need for protective custody, except to say someone on his housing unit
threatened him.

He was returned to his previous housing unit on June 3, 2020.  He was interviewed on
June 22, 2020, and during that evaluation, he appeared anxious.  He questioned whether

there could have been a misdiagnosis about having schizophrenia.  He told the evaluator that he had spoken with other inmates about typical symptoms of schizophrenia and that he did not have those symptoms (focusing specifically on auditory and visual hallucinations).  He stated that his belief that he received his diagnosis because of his belief that he was a saint or a higher level being and he stated that these beliefs were "something religious between me and God" but had nothing to do with mental illness.  Mr. Kidder was apparently interviewed several times.   During one interview, he repeatedly peered out the window behind him before responding.  He seemed concerned about other individuals hearing what was being said about him and asked, "How often do people with my crime get attacked here?"  Mr. Kidder appeared highly anxious, stating he hoped no one heard the discussion, because if they did, he would likely be attacked or killed.

Mr. Kidder was administered the PAI (Personality Assessment Inventory, which is an instrument used to broadly evaluate personality traits in an individual).  The scores suggested that he attended appropriately to the test items and responded consistently to similar items, but there were indications that he tended to present himself on a consistently favorable light, and is being relatively free of common shortcomings to which most people would admit.  He appeared reluctant to acknowledge personal limitations, and tended to repress or deny the stress or other problems that might arise from those limitations.  Mr. Kidder may minimize or possibly be unaware of problems or other areas of less than optimal functioning.  Therefore, the evaluators noted that the PAI profile may under represent the extent and degree of any significant findings.  In addition, the possibility of denial of problems of drinking and drug use should be considered as people with this response style may attempt to minimize the impairment that results from such problems.  Despite the level of defensiveness observed in Mr. Kidder's response style, there were some areas in which he described problems of greater intensity than is typical of defensive respondents.   These areas included impaired empathy, frequent routine physical complaints, and inflated self-esteem.

The PAI showed no elevations that would indicate the presence of clinical psychopathology.  The clinical profile was entirely within normal limits, however, there was some denial or defensiveness which was likely responsible for the general trouble-free picture that he reported.  Interpersonally, the profile characterized him as valuing harmonious relationships and deriving much of satisfaction from such relationships.  He is, therefore, likely to be uncomfortable with interpersonal confrontation or conflict, and he may tend to shun controversy.  He is likely quick to forgive others and give them a second chance.  The defendant reported experiencing an average level of life stress, and a large number of supportive relationships that can buffer against the effects of the stress.  He reported a substantially lower level of interest and motivation for treatment compared to people who are seen in treatment settings.

The Shipley-2 was administered as a brief measure of cognitive functioning and impairment.  His score of 95 fell in the average range of overall cognitive functioning and was in the 37th percentile.  There was no significant difference between Mr. Kidder's

KIDDER, Brandon                                                                                                11
Pre-sentence Forensic Psychiatric Evaluation
November 8, 2021

verbal and nonverbal performance on this test, suggesting these abilities were about
equally developed.  He also obtained an abstraction standard score of 101, which also fell
on the average range of functioning and in the 53rd percentile.  This subscale measures
fluid cognitive ability, such as the ability to use logic and other skills to learn and acquire
new information.

It was the opinion of the evaluator that Mr. Kidder did not meet criteria for schizophrenia
as he did not exhibit hallucinations, disorganized speech or behavior, or negative
symptoms.  Although, they acknowledged that his grandiose beliefs were unusual, they
appeared exclusively rooted in his religious beliefs, and there was no observable
grandiosity outside of those beliefs during the evaluation.  They did not appear inflexible,
and he appeared to modify them with feedback.  Moreover, they believed that it did not
appear to have impact his current functioning.   That is, he was able to interact
appropriately with other inmates without referencing them, and they did not appear to
particularly dictate his behavior.  The evaluators believed that a more fitting explanation
for Mr. Kidder's symptom presentation was that he had a personality disorder, and they
ultimately diagnosed him with Schizotypal Personality Disorder.  They also considered
the possibility of pedophilic disorder, given that the current charges were suggestive of a
pattern of sexual interest in children, he had also admitted to investigators that he
masturbated to the images he viewed of child pornography with infant and prepubescent
children, and he disclosed to the examiner that he viewed such images for several years.
They did not definitively diagnose Pedophilic Disorder because he did not admit to
preferential interest in children during the present evaluation and also because the charges
were allegations of which he had not yet been convicted.

With regard to his fitness to proceed, they had no concerns about his competency to
proceed with the adjudication process.  They concluded that he displayed adequate
factual understanding of core procedures and was able to learn and retain new
information of which he was previously unfamiliar, demonstrated a rational
understanding of the procedures, showing the ability to apply the concepts relevantly on
his case.  They also believed that he possessed the capacity to cooperate with counsel.

**Records from Bureau of Prisons Health Services**
The note from May 8th indicates that he was a new admission with no mental or medical
health records to review period arrived with a prescription for hydroxy Zine for his self-
report of schizophrenia. A request was submitted to continue nonformulary hydroxyzine.
No abnormalities were noted on a mental status exam. It appears that a request was made
to continue this medication. A note from May 20th, 2020 indicates that Mr. Kidder was a
new admission designated forensic study, seen on housing unit, arrived from county with
prescription for hydroxy Zine, no collateral records. Under mental health, he was
described as alert and oriented, with appropriate mood. History of mental health
treatment was described as "none." Substance abuse treatment or use was denied. The
plan was to follow up as needed and to notify psychology duty officer. It is not clear that
any medication was prescribed at that time.  There are no other notes that document a
psychiatric evaluation from a clinical standpoint.

KIDDER, Brandon                                                                                    12
Pre-sentence Forensic Psychiatric Evaluation
November 8, 2021

There is a consent form filled out by Dr. Bonnnie Nowakowski dated May 8th, 2020, for Abilify (an antipsychotic). However, on closer inspection it appears that it may have been for a different inmate and not Mr. Kidder and that that sheet was misfiled in Mr. Kidder's chart.

**Records from Cattaraugus County Jail**

Kidder was transferred to the Cattaraugus County jail from the northeast Ohio correctional facility. Mr. kidder was screened by a nurse on October 29th, 2020. At that time, he denied any hallucinations. His thought process was described as organized and logical, but his affect was flat. He reported being told that while housed in the Chicago federal prison he was told he did not have schizophrenia. He did not want to take any mental health medication at that time.  There is in a subsequent note dated November 25th 2020, he admitted to nursing staff that he had not been able to sleep for 10 days. He admitted to auditory hallucinations saying negative things to him such as" religious people telling him [he's] going to go to hell."  He was religiously preoccupied and concerned that he would go to hell. He was reluctant to admit to a diagnosis of schizophrenia. Orders were received by the psychiatrist to start him on Zyprexa 10 milligrams a day and Vistaril 25 milligrams three times a day.  notes from subsequent days indicated that he felt much better once the medication was restarted. He had reduced negative auditory hallucinations and anxiety. He was seen for an initial psychiatric evaluation On December 4th 2020. He reported a past psychiatric history of schizophrenia Anne was prescribe Zyprexa 10 milligrams at bedtime and Vistaril 25 milligrams three times a day. He reported that his symptoms started in the beginning of 2020 and that he was hospitalized at Erie County Medical Center for 10 days and was tried on Risperdal but had some side effects and he took it only for a couple of months, and when he got to Niagara County he was switched to Zyprexa which he tolerated better, however he was having some side effects including his legs shaking, his left leg going numb, and some sinus issues as well as chest pain. He described no current psychiatric symptoms and denied any hallucinations or delusions at that time, but have been having some crying spells, depression, low motivation and low energy, and was fearful because of his legal case. The Zyprexa dose was reduced to 7.5 milligrams at bedtime, and Vistaril (hydroxyzine) was continued for anxiety. He was seen again on January 14th. He reported that he was doing well but still having side effects of Zyprexa which he described as shortness of breath, chest pain, leg shaking. He denied any hallucinations or delusions. On mental status exam none were noted, so Zyprexa was decreased further to 5 milligrams at bedtime. He was then seen again on March 25th, 2021. He reported that leg shakiness had improved but was still there. Again, no auditory or visual hallucinations or other psychotic symptoms were reported or noted. Zyprexa 5 milligrams was continued.
the last clinic entry date was April 22nd, 2021. On that occasion, he refused to see the psychiatrist.

**MMPI-2 INTERPRETATION**:
Mr. Kidder did not appear to have any difficulties in understanding the content or responding to the format of this personality inventory.  It was noted that he was

KIDDER, Brandon                                                                    13
Pre-sentence Forensic Psychiatric Evaluation
November 8, 2021

extremely guarded and safe and self-favorable in his approach.   The clinical scale elevations he obtained were likely to be suppressed and possibly inappropriate for him because of his defensiveness.    There are concerns that he was seriously under emphasizing severity of his disturbance and that it incompletely reflected various underlying aspects of his current emotional state.  He made almost no atypical and rarely given responses to the items in the second half of the inventory.  This was consistent with a relative absence of such rare answers to the earlier MMPI-2 items.  The profile clearly did not appear to be of questionable validity because of atypical responding.

The supplemental validity scale suggested that his extensively self-favorable responding on scale K derived largely if not entirely from an intentional effort to "look good" on the MMPI-2.  He responded "too positively" to a great many of the MMPI-2 items.  Many of his clinical scales are actually seriously under elevated.  This may reflect guardedness and denial, and meticulous refusal to admit any false or improprieties that might be held against them.  The score strongly suggested that somehow we had to take the MMPI-2 "against his will" and that he was greatly protective as to how the test results might reflect badly on him or be used against him.

**Symptoms and personality characteristics**
The profile indicated a mild level of depression.  Underneath his outward correctness, he would currently be getting only a limited amount of joy out of life with a sense of being unappreciated and misunderstood.  The profile showed personality disorder tendencies, but these tested as within the normal range.  At times, he would be seen as egocentric and demanding.   His correct and formal manner could lead this to his being seen as unemotional if not as cold and ungiving.  Resentments of authority figures and the family restraints on a self-gratification are indicated.   Recurrent family conflicts and guilt struggles are likely to be stressful and upsetting to him, although he would have many ways of minimizing such struggles.  He can also be seen as occasionally self-defeating and self-punishment and as uneven in his judgment and forethought.  The pattern has relatively often being associated with history of sexual problems and with feelings of dissatisfaction around the patient's current sexual gratifications.   Verbalized sexual frustrations are likely to cover over conflicts around a sexual wishes and current temptations.  His overall balance of masculine and feminine interest is within the normal range for his age and education.

**DEFENDANT'S VERSION OF THE INSTANT OFFENSE:**
With regard to the conduct resulting in the current charges, Mr. Kidder stated that in his mid 20s, he learned about the "dark web" and specifically the Tor browser.  He stated that when he first used the Tor browser, he found many different categories that were of interest to him, including topics related to supernatural, erotica, religion and guns.  He stated that he explored all of these topics, including those of a sexual nature, but stated that his initial searches tended to focus more on UFOs and extraterrestrial and supernatural phenomena, based on looking for more information to try to explain his own personal experiences (which likely mostly reflected his emerging psychotic symptoms).  He stated that it was very easy to find all types of other problematic material in enormous

volumes once "inside" the dark web.  He stated that he was aware that already being in this type of network was bad, but he stated that he spent a lot of time on it because he had a lot of curiosity over what was being posted and he was relatively socially isolated otherwise.  He stated that he spent most of his waking hours on the internet and estimated that at least half of his time was spent on massive multiplayer interactive video games, particularly Final Fantasy II.  He described in detail that he started playing this game at the age of 20 and had accrued 900 days of total game play since the age of 25.  He stated that he started downloading some of the erotica links around the age of 28 or 29.  He stated that he was mostly interested in "teen stuff" but admitted that he would click on "anything and everything", both still pictures and videos.  He stated that he found the dark web "fascinating", although at same time, he was very disturbed by the images of violence.  He stated that he was not sexually aroused by the violence in the sexual videos, and that he also would click on links and videos depicting non-sexual violence (such as decapitations), although he stated that he would often not be able to finish watching the video due to the content being too disturbing and would quickly delete many of them, although stated that he is aware that often "deleting" does not completely erase his history.  He stated that there was "a lot of stuff" on his computers that he did not even view, because he would just download massive file folders with many pictures and videos.  He stated that he never reached out to establish an online relationship with anyone, and never had any interest in any contact with any children and stated that it actually "revolted him" to consider doing this in-person.  He stated that watching some of the hurtcore videos made him "lose faith in humanity."  He stated that his age preference for sexual videos that were arousing to him involved seeing children between the ages of 12 and 16.  However, he reiterated that he had no plan to communicate with any children in this age range or recreate any of the things that he saw on videos.  He denied any interest in males.

**COLLATERAL INFORMATION FROM JEREMY KIDDER:**
Mr. Jeremy Kidder is Brandon Kidder's younger brother.  He is younger by 18 months, grew up with Mr. Kidder for all of his life, and was recently renting the apartment Brandon was residing in with two other roommates.  Jeremy stated that Brandon's personality changed around the age 10 or 11.  He stated that Brandon became a lot more reclusive, and it became more and more difficult to get him to go out and do anything.  He stated that it was difficult for Brandon to engage with other people.  He acknowledged that the divorce of his parents would have been a difficult situation.  He stated that there was a lot of moving around and that they would have attended at least 9 or 10 different public schools between middle school and high school.

Jeremy was Brandon's roommate around the ages of 25 or 26, and he stated that it was very difficult for Brandon to get to work at that time.  Ultimately, Jeremy got Brandon a job at Majestic Pools company, and he believes that he was given a lot of leeway because Jeremy was a well-liked employee and had made the recommendation for Brandon to work there.  He stated that attendance had become a problem, and ultimately after Brandon did not show up to work, he "basically quit."  To Jeremy's knowledge, there were no significant racial issues with other employees or customers.  Jeremy stated that

KIDDER, Brandon                                                                                    15
Pre-sentence Forensic Psychiatric Evaluation
November 8, 2021

before the age of 25, Brandon would basically just keep to himself, but that he really did not have any significant responsibilities. He had no interest in getting a driver's license, and did not obtain one until 24, and even then, really did not drive much and did not even want to get a vehicle even though he could have afforded it. He stated that Brandon was able to walk to and from his jobs. He stated that Brandon's interest included "basically just playing video games." Brandon would leave the house to go and get groceries, but that was about it. He recalled that when Brandon was in school, he would dress very odd, and he was very much into Marilyn Manson. Did not have a lot of friends. Did not have any girlfriends. Did not seem to have any interest in dating. He believed that there was some self-esteem issues because the family grew up very poor, and at one point, lived in a trailer park. He described Brandon as being "very into music" and would spend hours on end memorizing music lyrics. He stated that Brandon was never on social media ever, and did not express any interest whatsoever in online dating or relationships. Jeremy stated that he had no concerns that Brandon was interested in children, and that the charges have been a total shock. He did state that Brandon was very much into guns and that their grandfather had taken them hunting often when they were children, but that Brandon was never really interested in continuing that. However, the whole family was very gun enthusiasts. He stated that at times Brandon's reluctance to leave the house bordered on paranoia, he stated that "you could see the anxiety when he went out." He would seem very out of place, seemed very paranoid, but he would never talk about it, he would just want to get back home right away." He then mentioned that Brandon had talked about seeing and hearing some things at age 25 or 26 (related to the incident that Brandon described as a "ball of light") and this is when Brandon started talking about extraterrestrials. He stated that "It really freaked him (Brandon) out." He stated, "he was really freaked out and he slept on my bedroom floor for a couple of nights, he was very shook." He then stated that Brandon would say weird stuff like he (Brandon) was an extraterrestrial himself. Jason stated that his parents were religious, but not extreme, and did not even attend church every Sunday. He stated that Brandon was "anti-religion" at one point as a teenager, but right after the event that happened at age 25 (with the ball of light), Brandon started reading the Bible and getting very religious, and unusually religious since then. Jeremy stated that he has been a lot more focused on religion than the average person, thinking that he is "the chosen one" and "taking it to another level for sure, memorizing verses, repeating them over and over, at random times, for no reason at all." He also stated that Brandon has had "the most sheltered life of any human being I know." To his knowledge, Brandon has had no history of self-harm or suicidal ideation. He had no concerns about Brandon using any drugs or alcohol and stated "He is pretty anti-drinking or drugs." He stated he had may be "four guns at the end." He stated that he never had concerns about Brandon using the guns in any kind of threatening way. He also stated, "His mood was really pretty good. He seemed to be the most content when he had limited responsibilities and no stress at all." He does believe that Brandon is different on medications than when he is off medication. He stated that when he was on antipsychotic medications after he left ECMC, Brandon was more willing to leave the house, although this also coincided with his computer access being taken away, so perhaps there was the need to sign something else to spend time on. However, he also stated that "after he left ECMC, he was more mellow and calmer, and he did not bring up

religion in a while."  He believed that Brandon had a hard time when he was in Chicago MCC because he was "locked up 23-1/2 hours a day."  He did not get to talk about with Brandon during that time, but he found it notable that Brandon had not talked about religion recently to him.  He does not believe that Brandon is currently depressed, and he did not offer any history of manic symptoms.  To the extent that he would not sleep, it would usually be because he was playing video games online.

**COLLATERAL INFORMATION FROM DARLENE KIDDER:**

Mrs. Darlene Kidder stated that she believes she noticed there was something different about Brandon since he was 2 years old.  He stated that she initially had concerns that he might have autism.  She stated he was a very "alone kid."  He was the kid that was always off in the corner, not interacting with other kids.  She stated that she did home daycare for many years, and there was always many children in the house, but Brandon had no interest in interacting with them.  She also stated that he had difficulty with loud noises.  She stated that when Brandon was 4 years old, his younger brother died of fits.  She also recalled that starting around the age of 10 until the age of 14 or 15, he would repeat the things he would say under his breath constantly.  He stated that this stopped after a while, after a kid started picking on him about it at school.

Mrs. Kidder was 23 years when she developed significant depression after one of her children died, and increased her alcohol use significantly after that, which she stated had "always been an issue with Brandon.  He does not like it when I drank."  She stated that Brandon was labeled "emotionally disturbed" in school, due to some of his fashion choices.  She stated that he underwent some counseling through school but was never diagnosed with a learning disability.  She confirmed that there was a significant episode around the age of 24 or 25, that resulted in a significant change for him.  She stated that "It was 3 a.m. and he called everyone to discuss the light.  He said that they told him that he was a supreme being.  It terrified him."  She stated that family did not know what schizophrenia was at that time, and that even though they wanted to get him help, they could not make him get help and he refused any kind of counseling.  She stated that he was an avid gun owner, but described him more as a collector as opposed to a hunter.  She confirmed that his grandfather got him into the gun scene and that he had four guns that were legally acquired.

She stated that as time went on, he developed some delusions that he was a supreme being.  She stated, "Sometimes he was St. Michael, Allah, Jesus Christ."  She stated he was always a "chosen one."  She never had concerns about him being dangerous.  She also stated that "I think he got into the online stuff because of Allah, he was going on sites where they were doing weddings of young girls and he went down that rabbit hole."  She also stated that she believes that Brandon thinks "This is all a fantasy land and that the stuff that he was watching wasn't really real to an extent."  She confirmed that he had no interest in dating, and may have had one girlfriend that he started to see when he was 14 or 15, but that he developed mono after he kissed her, and he became convinced that he was being punished and broke up with her and never pursued any other romantic relationships after that "because he was sinning."

She had no concerns about Brandon using alcohol or drugs.  She stated that he did not have a driver's license till he was 24, and even then did not have any interest in having a car.  She stated that he was terrified to take the road test and panicked.  He did not see this as a form of independence and relied on family to take him shopping for food, she also stated that she would go over to the house every Saturday to help him clean.

She stated that she noticed that when the facility in Ohio stopped his antipsychotic medications, he became progressively worse, which improved after Cattaraugus County restarted the medications.  She stated that the medications were restarted after he called her very early in the morning and told there was a man in his cell named "Death".  She stated that she could tell he was very scared and called the facility to advise the doctor of what had happened.  She reiterated that, from her perspective, Brandon has "zero violent tendencies."

She also stated that after the FBI raided his house, he had a 'horrible meltdown" and was "freaking out."  She stated "He didn't think anyone had any authority over him, he said things like, "they don't know who I am."  She stated that her first thought about why the FBI was seizing his computers was that he had tried to get some kind of illegal gun online, but she never thought that there would have been any kind of sexual material, and specifically nothing related to minors.  She has remained in contact with Mr. Kidder and she thinks that he still believes that he is "some kind of supreme being", although he is less preoccupied about this now than he has been in the past.  She believes that his newest belief is that he is St. Michael because St. Michael is "directly under god."  She believes he has some poor insight into the consequences of these charges including the fact that he does realize that he will never have a gun again and that the charges will never completely go away.

**MENTAL STATUS EXAM ON AUGUST 27, 2021**
Mr. Kidder was interviewed in a private room at the Cattaraugus County jail. He was cooperative, well groomed, clean, and cooperative. He made good eye contact. His speech was normal rate volume and tone without any evidence of thought disorganization. He indicated that he had been compliant with his medications for the last several months. However, he continued to question whether he truly had schizophrenia, latching on to the information that he had been given in the federal prison in Chicago, where he was told that he likely did not meet criteria for this. He described his mood as good. His affect was euthymic. He stated that his appetite was normal, and he had recently tried to lose weight deliberately, and had gone from 225 pounds to 160 pounds following mainly a ketogenic diet. He stated that he does order commissary. He described having quote a lot of energy and quote an being somewhat bored at times, although was enjoying reading fantasy books that his family was sending to him. He described his sleep as increased sometimes quote all day everyday. And quote he denied any suicidal ideations, passive death wish, plan, or intent to engage in self injury. he continued to endorse some hyper religious beliefs, believing that somehow he was chosen and was being spoken to by God and that there was a purpose in his life to defeat the seven deadly sins, which included dying a virgin in order to defeat the sin of lust. While he did not

definitively state that he was anything other than human, he did question whether he had been selected in some way by someone which made him different from other individuals. He believed that a lot of things have happened to him that cannot be explained, starting with the "ball of fire across the street" that he saw when he was around 25 years old. He stated that he has received evidence that extraterrestrials exist in the form of "something like a download." And he believed that all music ever created was influenced by extraterrestrials to some extent, and that extraterrestrials can be angels or demons. He stated "if they released the truth people would freak out if they knew what was around them. People would think I was crazy if I talked about it. They influence a lot more than people think. It's almost like I'm in something like The Truman Show." He spoke about believing that he was being tested: "I am following the lamb, he who overcomes will inherit this..." He also stated, "I believe that I am the life but I'm not supposed to talk about it." He presented as future-oriented, stating that when he got out of prison, he planned to live with his mother, possibly apply for Social Security disability "my mom is trying to get me to do this even though I don't think I'm schizophrenic." He denied any significant anxiety, although was appropriately concerned over his legal charges and disposition of his case. There was no evidence of mania. Insight into his legal situation was fair, however he had limited insight into his need for treatment as he continued to deny that he had any major mental illness.

**DIAGNOSTIC IMPRESSION:**
It is my opinion that Mr. Kidder meets criteria for Schizophrenia. Although he was diagnosed with Schizoid Personality Disorder while in federal custody, I believe the longitudinal history and overall presentation is more consistent with Schizophrenia, a major mental illness that will require life-long treatment with antipsychotic medications. The early odd behavior noted as a teenager could have certainly reflected what is referred to as "prodromal" symptoms, which can last for several years before full-blown psychotic episodes occur. It is also possible that both conditions are present, with Schizoid Personality Disorder being present since his early teenage years, followed by a more dramatic and acute decompensation more consistent with Schizophrenia that started around the age of 25. There was a very clear break at this time, different from the odd personality characteristics that were present in high school (interest in goth culture, Marilyn Manson, etc.) What was albeit a fringe group affiliation, was not an idiosyncratic lifestyle, but did progress to him leading a life of social isolation, obsessions with religion, and development of beliefs that go beyond what is culturally accepted and are frankly delusional. Mr. Kidder likely was able to avoid psychiatric treatment for years due having family supports for financial matters, limited expectations, and few social responsibilities. Despite the lack of early treatment with the emergence of his psychotic symptoms, he was clearly quite ill for years prior to receiving the diagnosis of Schizophrenia in 2020.

**According to the Diagnostic and Statistical Manual of Mental Disorders 5th Edition (DSM-5), the criteria for a diagnosis of Schizophrenia are as follows:**

**A. Characteristic symptoms**: Two (or more) of the following, each present for a

significant portion of time during a 1-month period (or less if successfully treated):
• delusions
• hallucinations
• disorganized speech (e.g., frequent derailment or incoherence)
• grossly disorganized or catatonic behavior
• negative symptoms, i.e., affective flattening, alogia or avolition
Note: Only one Criterion A symptom is required if delusions are bizarre or hallucinations
consist of a voice keeping up a running commentary on the person's behavior or thoughts,
or two or more voices conversing with each other.

**B. Social/occupational dysfunction**: For a significant portion of the time since the onset
of the disturbance, one or more major areas of functioning such as work, interpersonal
relations or self-care are markedly below the level achieved prior to the onset (or when
the onset is in childhood or adolescence, failure to achieve expected level of
interpersonal, academic, or occupational achievement).

**C. Duration**: Continuous signs of the disturbance persist for at least 6 months. This 6-
month period must include at least 1 month of symptoms (or less if successfully treated)
that meet Criterion A (i.e., active-phase symptoms) and may include periods of
prodromal or residual symptoms. During these prodromal or residual periods, the signs of
the disturbance may be manifested by only negative symptoms, or two or more symptoms
listed in Criterion A present in an attenuated form (e.g., odd beliefs, unusual perceptual
experiences).

**D.** Schizoaffective disorder and depressive or bipolar disorder with psychotic features
have been ruled out because either no major depressive, manic or mixed episodes that
have occurred during active-phase symptoms or any mood episodes that have occurred
during active phase symptoms have been present for a minority of the total duration of
the active and residual periods of the illness.

**E. Substance/general medical condition exclusion**: The disturbance is not due to the
direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a
general medical condition.
Mr. Kidder does not have a history of substance abuse, so this is not a contributing or
confounding factor to his symptoms.

Mr. Kidder has demonstrated significant impairment in social and occupational
functioning as a result of his inability to interact with individuals in a normal fashion due
to his Schizophrenia.  At times, his paranoia has resulted in such anxiety that he has not
wanted to leave the house and it has impaired his ability to establish normal relationships,
as well as his perception of reality.  His impaired ability to relate to others has also made
it difficult to establish a normal romantic relationship.  He is vastly more comfortable
interacting with others on the other side of a computer screen than in person.  Having a
supportive family and some financial resources has unfortunately enabled him to
maintain a very isolated lifestyle, which is likely the main driver for him seeking various

types of material on the internet, some of which included child pornography.  However, he has never attempted to engage an individual for purposes of personal contact, nor is there evidence that he has even engaged in any contact sexual offenses. To some extent, his grandiose delusions allowed him to explore these aspects of the dark web as he appeared to believe that he was not someone they would be able to come after (per his mother, he expressed surprised that he was being arrested given who he was).

A diagnosis of pedophilic disorder was considered, but I am not diagnosing Mr. Kidder with this at this time.  This diagnosis requires that:

A.      Over a period of at least 6 months, recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger).

B.      The individual has acted on these sexual urges, or these sexual urges or fantasies cause marked distress or interpersonal difficulties.

It is not clear that Mr. Kidder is recurrently sexually aroused by prepubescent children, and he has not exhibited any online behavior suggestive of progressing to contact offenses.  He admittedly downloaded a variety of disturbing material, some sexual, some non-sexual, and was likely in a psychotic state for much of that time when he was browsing and downloading this material.

**RISK ASSESSMENT:**

Mr. Kidder has no past legal history, and there is no history of conduct disorder symptoms or antisocial personality disorder.  He has a very limited relationship history and no prior history of sexual relationships, something that Mr. Kidder appears to be actively avoiding, in part, due to his delusional belief system that includes that he must defeat the Seven Deadly Sins.  Mr. Kidder does not have a history of any problematic sexual behaviors and/or paraphilia history with other individuals and did not report distinguishable characteristics that would be considered atypical regarding sexual arousal within the criteria that relate to the 8 paraphilic disorders in the DSM-5 including exhibitionism, voyeuristic, frotteuristic, sexual masochism/sadism, fetishistic, transvestic and pedophilic disorders (and Mr. Kidder did acknowledge that masturbating to pornography would not be held against him with regard to defeating the deadly sin of Lust).

Given his lengthy, untreated history of schizophrenia, which included numerous delusional beliefs about religion and his own destiny and distorted perceptions, it is not difficult to see how Mr. Kidder would have been curious and attracted to material that is on the Dark Web.  Certainly, once he was able to access this, he had easy access to child pornography, even though he denied that this was the initial urge or reason for him to go to the Dark Web, which seems believable given the nature and timing of the development of his delusional beliefs.  His social isolation and relative absence of responsibilities and other activities to devote time to contributed to him spending vast amounts of time on the internet and consequently on the Dark Web, where he eventually became exposed to child porn.

KIDDER, Brandon                                                                                    21
Pre-sentence Forensic Psychiatric Evaluation
November 8, 2021

Typical sex offender risk assessment instruments such as the STATIC-99 cannot be used
with an individual who has no prior sexual offense history and whose only charges
(which are expected to result in a conviction from a plea) involve Internet crimes.
According to the STATIC-99 rules, Internet crimes were not recorded in the original
samples for the STATIC-99 because the Internet had not advanced to the point where it
was commonly available. Additionally, Mr. Kidder's online activity did not involve any
attempts at contacting individuals or attempt to engage in sexual contact with minors, so
are not a category of crimes that is used with the STATIC-99.    I would consider him at
low risk to continue to engage in similar behavior or to initiate any type of contact with a
minor for purposes of sexual contact.

Please do not hesitate to contact me with further questions.

Sincerely,

Ana Natasha Cervantes M.D.
Forensic Psychiatry Fellowship Program Director, SUNY at Buffalo
Diplomate A.B.P.N.
Board Certified in General and Forensic Psychiatry