**U.S. Department of Justice**

Federal Bureau of Prisons

*Metropolitan Correctional Center*

*71 W. Van Buren Street*
*Chicago, IL 60605*

## FORENSIC EVALUATION

**NAME: KIDDER, Brandon**
**REGISTER NUMBER: 01435-509**
**DATE OF BIRTH: June 16, 1984**
**DOCKET NUMBER: 20-mj-1010**
**DATES OF EVALUATION: June 3 to August 31, 2020**
**DATE OF REPORT: October 13, 2020**

DRAFT

### IDENTIFYING INFORMATION AND REASON FOR REFERRAL:

Mr. Brandon Kidder is a 36-year-old, Caucasian man who was referred for competency and criminal responsibility evaluation by the Honorable Jeremiah J. McCarthy of the United States District Court for the Western District of New York. Mr. Kidder has been charged in that jurisdiction with Sexual Exploitation of Minors and Activities Relating to Material Containing Child Pornography, in violation of Title 18, U.S.C., §§ 2252A(a)(5)(B), 2252A(b)(2), and 2252A(a)(2)(A). The referring Court has requested that the evaluation include an opinion concerning Mr. Kidder's competency to proceed on these charges, as well as his mental state at the time of the alleged offense. The present evaluation was conducted under the provisions of Title 18, U.S.C., §§ 4241, 4242, and 4247. Mr. Kidder is represented in this case by Dominic Saraceno and formerly by Michael R. Zosh. The Assistant United States Attorney (AUSA) assigned to the case is Caitlin M. Higgins. Because criminal responsibility does not become an issue until competency is established, the present report will only address the defendant's competency to proceed. Mr. Kidder's criminal responsibility will be addressed in the accompanying addendum.

### NOTIFICATION:

The defendant arrived at the Metropolitan Correctional Center (MCC), Chicago, Illinois, on May 8, 2020, for forensic evaluation. He underwent a period of quarantine and a re-assignment of evaluator prior to the initial interview with the undersigned psychologist. During that interview, Mr. Kidder was informed of the nature and purpose of the evaluation. He was further informed that any information he provided in interviews or test responses, any of his statements or actions while at this facility, and any other information obtained about him would be subject to inclusion in a report that would be prepared and submitted to the Court. Mr. Kidder was informed that this written report summarizing the evaluation findings would be provided to the Court, the defense attorney, and the prosecuting attorney. He was told that this report could be used during any phase of his legal proceedings, and that this examiner could be called to testify regarding the report and the data that informed the conclusions contained therein. Mr. Kidder expressed understanding of this information, was able to paraphrase it in his own words, and agreed to participate given the

FORENSIC EVALUATION - Page 2 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

parameters described above.  He signed the Statement of Understanding summarizing this information.

## SOURCES OF DATA:

The present evaluation was conducted at MCC Chicago.  Throughout the evaluation period, Mr. Kidder was routinely observed on his housing unit by correctional and psychology staff.  A routine medical history and physical examination was conducted.  Mr. Kidder was clinically interviewed and assessed by the undersigned psychologist over multiple formal meetings, as well as numerous briefer and informal contacts, throughout the evaluation period.

The following psychological assessment tools were utilized for the evaluation:

1. Personality Assessment Inventory (PAI).
2. Shipley Institute of Living Scale – Second Edition (Shipley–2).
3. Revised Competency Assessment Instrument (RCAI).

The following documents and materials were reviewed as part of the evaluation process:

1. Investigative records, Federal Bureau of Investigation (FBI); dated December 20, 2019, to March 6, 2020.
2. Treatment records from Erie County Medical Center (ECMC); dated February 3 to 12, 2020.
3. Affidavit in Support of Rule 12.2 Notice of an Insanity Defense; dated March 13, 2020.
4. Affidavit in Support of Release and in Response to Pretrial Services Report; dated March 13, 2020.
5. Criminal Complaint, United States District Court for the Western District of New York; dated March 17, 2020.
6. Order for Psychiatric Examination, United States District Court, Western District of New York; dated March 17, 2020.
7. USM-129 Individual Custody/Detention Report; dated April 3, 2020.
8. Criminal Docket; printed June 15, 2020.
9. Federal Bureau of Prisons (BOP) security records (SENTRY), Bureau Electronic Medical Record (BEMR), and Psychology Data System (PDS) records; various dates.
10. Telephone calls placed from Mr. Kidder's account at MCC Chicago; various dates.

The following collateral contacts were made:

1. Dominic H. Saraceno and Michael R. Zosh, Defense Attorneys; e-mail correspondence.
2. Caitlin M. Higgins, Assistant United States Attorney (AUSA); e-mail correspondence.

FORENSIC EVALUATION - Page 3 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

## BACKGROUND INFORMATION:

Mr. Kidder was overall a good historian. The information he provided was generally consistent
with collateral sources. The history that follows in this section is based on a combination of
Mr. Kidder's self-report and information obtained from collateral sources.

**Developmental History:** In regard to his personal history, Mr. Kidder reported he was born and
raised in Alden, New York, a small town outside of Buffalo. He was primarily raised by his father,
Larry Kidder, as his parents split up when he was in fifth grade. He has two younger brothers and
one younger sister, all of whom also went to live with their father upon their parents' separation.
They continued to see their mother, Darlene Kidder, on "days off" and for periodic camping trips.
Mr. Kidder described his childhood as "hectic." He reported a "pretty good" relationship with his
father, who works in a machine shop. He stated his mother received Supplemental Security Income
(SSI) for Posttraumatic Stress Disorder, and experiences "drinking problems." The defendant
explained that when he was five years old, his younger brother died in infancy of Sudden Infant
Death Syndrome (SIDS). He identified the loss of his baby brother as his "earliest memory," which
he said he remembers vividly. Mr. Kidder stated his parents were "devastated," and subsequently,
there was "a lot of drinking on both sides." His father eventually stopped, but his mother continued
and they separated. He emphasized that his mother's drinking subsided when she became a
grandmother. The defendant stated he moved around a lot as his parents fought "custody battles,"
including a period of residence in Florida with his mother. Mr. Kidder denied any history of
physical, sexual, or emotional abuse during his childhood.

An e-mail sent by Mr. Kidder's mother to his first assigned evaluator detailed her early concerns
about her son. She said she first felt he was "different" when he was about two or three years old,
when she realized he did not play with the other children and tended to keep to himself. She asked
his pediatrician about it, and the pediatrician said, "Some kids are just less social than others."
Mrs. Kidder indicated her son, Jeremy, was born when Mr. Kidder was 18 months old, and that they
"are and always have been inseperable *[sic]*." However, she said Jeremy took on the role of "big
brother" as they got older. Mrs. Kidder said that when the defendant was four years old, she had
premature twins, Jesse and Justin. Justin died at 10 weeks old of SIDS (Sudden Infant Death
Syndrome). She noted that she "started falling apart" after his death, and had to have her sister take
care of the children. She stated the loss was very traumatic for the family, but "Brandon remembers
vividly." Mrs. Kidder stated the defendant was labeled "emotionally disturbed" at school during 7th
or 8th grade, and was given an Individualized Education Plan (IEP). She stated at that time, he
began wearing dark clothes, including a "long black robe," every day, and became "very
withdrawn." He started telling everyone he was Jesus at that time.

**Educational History:** Mr. Kidder recalled earning "very bad grades" in school. He reported being
diagnosed with a learning disability. Although he was unable to identify the nature of his disability,
he said it "took [him] too long to do things." He received extra time in the classroom and was taken
out of class so he could receive extra time for tests. Mr. Kidder dropped out of school during his

FORENSIC EVALUATION - Page 4 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

senior year and earned a General Equivalency Diploma (GED) "right away." He did not pursue any further schooling or certification.

**Work History:** The defendant reported having worked for a year as a dishwasher before earning his GED. He said he then worked for eight years at Town and Country Restaurant in bussing and food preparation. Next, he was employed at Majestic Pools for five years as a warehouse manager. Mr. Kidder stated he was not paid well; he was also dealing with customers for the first time, and had difficulties such as feeling as though his "blood pressure" was getting elevated during these interactions. Following his departure, Mr. Kidder spent a five-year period prior to his arrest on the present charges unemployed and living off of an inheritance he received from his grandfather. In contrast to his self-report, treatment records indicate Mr. Kidder's mother reported he had not worked since about age 20. However, investigative records included a statement from an acquaintance who said Mr. Kidder had to work in the warehouse because he was sympathetic to Nazi rhetoric, "occasionally performing Heil Hitler salutes and discussing Mein Kampf."

**Social/Relationship History:** Mr. Kidder said he had a lot of friends in his youth. He recalled engaging in somewhat unconventional self-expression as an adolescent. He listened to the artist Marilyn Manson and the band Cradle of Filth, wore "gothic stuff" (e.g., a trench coat and Marilyn Manson shirt), and said he shaved his head, eyebrows, and face at one point. He said he used to wear white contact lenses and "Marilyn Manson spikes." However, he said, "Then Columbine happened" and people began to look at him differently. He said, "There were a lot of people like me – I was not in the 'trench coat mafia;' I loved coats and guns." He said as an adult, he tends to play video games with friends online rather than in person.

Mr. Kidder has never been married nor fathered any children. He denied ever having been involved in any significant romantic relationships. In fact, he stated several times during the evaluation that he "defeated the seventh deadly sin of lust completely by overcoming it," that he is a virgin, and that he therefore expects to be absolved of his sins. Mr. Kidder stated that everyone he knows has girlfriends, but he does not want one because he has "strict religious beliefs." He stated he is "practicing a life of abstinence – I want to be a virgin for life." The defendant said people have made "assumptions" about the reasons for his lack of relationships, and his roommates have sometimes joked that he likes "younger girls" and likened him to Catholic priests who molest children. However, he said, "I would never do that. I know they're joking." After being asked about a reference in the investigative records to a statement by his roommate that he told a girl the roommate had invited over not to speak to him, Mr. Kidder adamantly denied this allegation and became angry that his roommate would say that. He described himself as "very antisocial when it comes to girls," stating, "I have like a social anxiety – I can't even talk to girls." When asked about that roommate's assertion that the defendant had told him he liked girls "12 and under" because he "couldn't train older girls," Mr. Kidder was similarly outraged and adamantly denied the assertion.

From the ages of about 30 to 35, Mr. Kidder resided with two roommates in Alden. Records show the residence was a duplex owned by his brother; his brother's girlfriend resided in the adjacent half. Mr. Kidder stated he worked with one of his roommates at Majestic Pools, and one of his

FORENSIC EVALUATION - Page 5 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

roommate's friends also moved in. He described a typical pattern of staying in his room and playing online games or watching videos he had downloaded online. In fact, he said he tended to "stay in the house every day, all day." Treatment records note the defendant's mother reported he had no rent responsibility because Mr. Kidder's apartment was in a building owned by his brother. She reported he did not drive; his family provided transportation when needed (by contrast, the defendant stated he drove and worked independently). They described him as introverted and stated he predominantly spent time on his computer.

Investigative records include accounts of Mr. Kidder engaging in unconventional social behavior. He was described as often wearing a trench coat, consistent with his self-report. Regarding the aforementioned report that he was sympathetic to Nazi rhetoric, he admitted to having shaved his head, eyebrows, and face, but said it was mainly because he tends to be "lazy" and when he plays a lot of video games, there is a "lot of hair everywhere." Mr. Kidder stated he was not a white supremacist and does not hate anyone. However, he said, "I believe people like me – not blonde haired or blue eyed – are being collected by God." He added that he believed the swastika was a "symbol of purity – I believe that," but he denied any hatred toward other groups. The defendant was also described as being obsessed with weapons. During the present evaluation, Mr. Kidder described himself as a "gun collector." He said he had "quite an arsenal," including over 4000 rounds of ammunition. He stated he shot clay birds but did not hunt, "because I could never shoot an animal or a person because it's a sin." Mr. Kidder stated he thought the prosecutor in his case was overly focused on his guns. He reported she said at one point that he had made a statement that he would kill anyone who took his guns, and that this was not true. However, in hospital records, a family member did report Mr. Kidder had made such a statement, and stated they feared getting crisis services involved because they feared he would have a "shoot out" with them.

**Substance Abuse History:** In regard to substance use, Mr. Kidder stated, "I've never been drunk or high in my life. I'm 100 percent against drugs or alcohol." He recalled that as a child, he once asked his mother for "pop" and she gave him pop with Jack Daniels in it. He described it as a negative experience. Similarly, his mother gave him a cigarette and when he tried to smoke it, his "lungs burned." Mr. Kidder expressed concern that he might get his mother in trouble with his statements. He added, "She always told me never to do what her and dad did [referring to alcohol and cigarettes]. Whatever she did, it worked." He stated that he never touched alcohol or cigarettes again after that. The defendant denied ever having tried drugs in his lifetime. There is no available information to suggest a history of drug or alcohol abuse.

**Medical History:** Mr. Kidder stated he had no chronic or acute health problems of which he was aware. Mental health records from a psychiatric hospitalization indicate a history of mitral valve prolapse since childhood. BOP medical records also note this history.

**Mental Health History:** Mr. Kidder denied any history of mental health treatment or diagnosis until late January or early February 2020, when he was questioned by agents regarding the present charges. He stated his house was "raided" and he was interviewed by agents but not detained at that time. Mr. Kidder said that because his brother, Jeremy, lived next door to him and was aware of

FORENSIC EVALUATION - Page 6 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

what had happened, Jeremy likely called their mother to inform her of what happened. The defendant's mother then drove over, picked him up, and took him to the psychiatric hospital. He said, "They think I had a delusionary break or something like that." He said his parents thought he lived in a "delusional video game world" and that the experience of being investigated "threw [him] out" of that world because he had never been in trouble before in his lifetime.

Mr. Kidder stated he stayed at Erie County Medical Center for nine days. He was diagnosed with schizophrenia while at the hospital. He stated he received prescriptions for the antipsychotics Zyprexa and Risperdal, but he experienced unwanted side effects such as restless legs, numbness in his leg, and chest pains. He said after his discharge, he continued taking the medications because "my mom said I had to take it or the hospital would come get me." The medications were ultimately discontinued by a doctor at a correctional facility in Ohio, who advised him he "shouldn't be taking them unless [he] absolutely need[ed] it." Mr. Kidder reported great relief after cessation of the medications, stating he felt like his health "skyrocketed" after he stopped taking them.

Mr. Kidder stated his belief that he received his diagnosis "because I'm religious. I believe I'm a saint – a higher-level being, like St. Michael. I defeated the seven deadly sins and follow the ten commandments. I don't know if the doctor was an atheist." He asserted his beliefs were "something religious between me and God," but had nothing to do with a mental illness. He expressed awareness that his beliefs are seen by others as "wacky" or "crazy," adding, "I'm religious. I know some things I say are off the wall." However, he explained that the Bible says when people die, they become an angel or a demon. He said he believes he will be an archangel "because I conquered the 7 deadly sins," and that if he dies a virgin, that will "cancel out" any past misdeeds. On several occasions, Mr. Kidder quoted Revelations 14:4, stating, "Those who have not defiled themselves, those who are virgins, in their mouth no lie was found and they are blameless in the eyes of the Lord." When asked to clarify whether he believes he is an angel now, or whether he will become one after death, he responded, "I believe I'm being tested."

The defendant denied any past or current hallucinations. However, he said he did experience a "realistic dream" in which he saw extraterrestrials approximately nine years ago. He denied any further experiences of this nature.

On several occasions throughout the evaluation, Mr. Kidder stated the events related to the alleged offenses constituted "the first time I've done something wrong in 36 years" or "the first mistake of my life." Mr. Kidder said he had "always [been] obsessed with religion" since he was young.

The defendant denied any history of suicidal ideation, intention, plan, or behavior. He further denied any history of homicidal ideation or violent behavior.

In discussing the alleged offense behavior (described in further detail in the accompanying addendum), Mr. Kidder reported spending substantial amounts of time viewing horrific acts of brutality on the "dark web" over the past few years. He asserted his exposure to these acts has

FORENSIC EVALUATION - Page 7 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

affected him emotionally. He said, "Before, everything was peaceful and happy. Now it seems like everywhere I look, there's brutal people out there." At one point, he stated he believed he may need counseling to help him deal with the things he has seen people do to other human beings.

Voluminous records from Erie County Medical Center (ECMC) were reviewed for the present evaluation. The defendant was admitted on February 3, 2020, stating, "My parents told me I had delusions of grandeur. I'm an extradimensional being." Intake notes indicate no prior mental health history, stating he was brought in by his family "in a state of acute psychosis…disorganized and very delusional." He had reportedly stockpiled an arsenal of loaded assault rifles (AK-47s) in his apartment, and was noted to have poor insight and judgment. He stated he was "controlling the thoughts of others" to fend off "zombies" in the world, described by staff as "bizarre delusions."

His parents informed that Mr. Kidder did not shop nor make food for himself. His parents advised that he had begun describing "an alien presence" when he was in his mid-20s, and that this belief had progressed to a belief that he was a supreme being with power over others, "significantly religiously preoccupied" with both Jesus and Allah at times, endorsing auditory hallucinations, and often tangential, rambling, and disorganized. He had no prior treatment, as his parents stated they had "sheltered" him. When a staff member observed Mr. Kidder in a "long black cloak," his mother stated it was "a robe…he wears it everywhere."

Mr. Kidder told ECMC staff he was "visited by beings from another world" many years ago. He said, "It looked like a ball of light. It hovered around Jerusalem." He came to believe that these extraterrestrials control humans and placed suggestions into people's minds who were around him. He stated he was a "divine being, on archangel level," who will "be the judge of all souls." Regarding his firearms, he said there are "demonic beings that work to try to lead you into the 7 deadly sins," and that he believes "a lot of people are zombies" and he needed the weapons to protect himself. He denied current perceptual disturbances, but reported hearing an unfamiliar female voice years ago, saying, "Please forgive me." However, he told another provider that he began to experience auditory hallucinations after high school and has continued to hear them since then. He also reported experiencing visual hallucinations. He reported being "incensed" that the FBI "broke in and pointed guns at me. You can't do that to a being of my level. They're in big trouble. I'm a very high level being and that's unacceptable."

During his hospitalization, the defendant was enrolled in group treatment, but tended to be "seclusive to himself." Although he was described as "pleasant," he was also noted not to have interacted much with peers or to be "receptive" to staff interviews. He was described as "delusional, with blunted affect." With antipsychotic medication (first olanzapine and then risperidone), his delusions persisted but the intensity of his beliefs diminished and it required conversation to elicit his grandiose ideation. His family thought he had improved as well. The defendant underwent a CT scan of his head, which was unremarkable. Mr. Kidder was diagnosed with Schizophrenia, "naïve to treatment." He was discharged to his mother's residence on February 12, 2020, with a prescription for Risperdal (3 mg daily).

FORENSIC EVALUATION - Page 8 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

A clinical summary of a visit at Pembroke Family Medicine was reviewed. The visit occurred on March 4, 2020, apparently to follow up after Mr. Kidder's hospitalization. He was seen by a Nurse Practitioner, Thomas Finn, ANP, who prescribed risperidone (Risperdal, 2 mg at bedtime) and the antidepressant Trazodone (50 mg prior to sleep, may repeat once if needed).

An affidavit written by the defendant's mother indicated that following his discharge from ECMC, Mr. Kidder was seen by Genesee County Mental Health on February 18, 2020 and had a follow-up appointment after his intake on March 3, 2020. He had a psychiatric evaluation scheduled for May 12, 2020.

Initially, Mr. Kidder expressed his belief that once he was diagnosed with a mental illness, he was permanently labeled as such. As the evaluation progressed, Mr. Kidder asked questions about whether misdiagnoses can ever occur, and once he understood that doctors can provide different diagnoses at different times, he strongly expressed his belief that he is not mentally ill. He stated he went 36 years without medication, stating, "I drove on my own, worked on my own, managed a warehouse." Mr. Kidder asserted that he was in somewhat of a "crazed state" when he was taken to the hospital because he had just had FBI agents confront him with guns; he stated, "Nothing like that ever happened to me before." He stated he believed his mother "labeled" him because he broke the law for the first time. He said that once he received the diagnosis at the hospital, his mother said, "Oh, that was the problem all along." He added, "She got my attorney on board" with identifying him as mentally ill, and stated, "Usually, my dad's against her trying to label me."

**Criminal History:** In regard to his criminal history, Mr. Kidder asserted the present charges represented the first time he has ever been in trouble in his lifetime. He emphasized numerous times, "I've never been in trouble in my life. I've never even gotten so much as a speeding ticket." There is no indication of any criminal history for the defendant in the available records.

**Current Charges:** According to the Criminal Complaint, on or about May 24, 2019, Mr. Kidder possessed and received child pornography in Erie County, New York. Specifically, he was in possession of a video showing a baby approximately six months to one year old being subjected to both digital and penile penetration; the baby was screaming throughout the video. Another image showed an approximately two-year-old toddler sitting nude on top of a man's erect penis, with what appeared to be semen on her torso. Other images included an approximately one-year-old female baby with a penis inserted into her anus and an adult hand holding her labia open, exposing her vagina; and an approximately six-year-old girl sitting on the floor wearing no pants, with her legs spread, exposing her vagina. Finally, three images of the same newborn female baby were found; this baby's umbilical stump recently fell off, suggesting she was only one or two weeks old. One image showed the baby with an erect penis in her mouth; one showed her vagina exposed and semen on her vagina and torso, and her anus appearing red; and one showed the baby crying with semen on her body.

Mr. Kidder was taken into custody at the Niagara County Jail on March 6, 2020. His attorney filed a motion in support of his release, in response to the pretrial services report recommending against

FORENSIC EVALUATION - Page 9 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

release. He indicated Mr. Kidder's parents assured they would supervise him "24-7," eliminate access to electronic devices, and would give him access to medical and mental health treatment that he "is desperately in need of." His mother stated the defendant would remain in his residence and that she, her ex-husband, or his brother, Jeremy, would stay with him pending trial.

## COURSE OF EVALUATION:

**Behavioral Observations:** Mr. Kidder presented as a 36-year-old, Caucasian man who appeared about his stated age. He was of average height and build, wore eyeglasses, and had dark hair and facial hair in the form of a moustache and beard. He presented as formal, serious, and anxious throughout the evaluation. He was consistently cooperative and polite during interviews and testing.

Mr. Kidder arrived at MCC Chicago on May 8, 2020, for evaluation. He was seen in the receiving area for forensic intake by the Chief Psychologist. He reported being hospitalized recently because of "delusional paranoia," stating his parents sent him there because he was "confident." He indicated he previously thought he was a "special angel of God" or a "person protected by saints." He said he was diagnosed with schizophrenia and no longer has any of the aforementioned beliefs because the doctors told him his thoughts were not true. Mr. Kidder denied any history of mental health problems and stated he did not experience any benefit from pharmacotherapy. The Chief Psychologist noted there was no evidence of genuine delusional thought content, and that his presentation was suggestive of an attempt to malinger mental illness. Based on the BOP COVID-19 protocol, he was placed in a 14-day quarantine unit on arrival.

On May 22, 2020, Mr. Kidder was seen at the door of his cell by the psychologist who was originally assigned to complete his evaluation during routine quarantine unit rounds. She explained to him that she would conduct his evaluation once he was released from quarantine. He stated his understanding and denied having any questions about the evaluation. He asked about the conditions of protective custody at MCC Chicago, though he denied having any immediate concerns about his safety.

The defendant was released from quarantine to an open population housing unit on May 29, 2020. On that date, this examiner was advised by the unit officer that Mr. Kidder's cell mate was "scared" of him, and that he has schizophrenia. Upon approaching the door, this examiner observed the defendant's cell mate standing on a chair by the door and Mr. Kidder sitting on the top bunk. The defendant approached the door, holding a bag already packed with his belongings, and stated he needed protective custody because he had schizophrenia and did not feel safe. When asked for more information about the nature of his safety concern, he attributed it to his symptoms (i.e., "hearing voices"). However, when advised that if he was hearing voices, he would likely continue to hear them wherever he was housed, Mr. Kidder asserted he needed protective custody. When advised protective custody is for legitimate threats to one's safety by another inmate (and not for symptoms of mental illness), he asserted he had this type of concern. Mr. Kidder was then

Sensitive – Limited Official Use

FORENSIC EVALUATION - Page 10 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

interviewed by the Operations Lieutenant, where he made vague comments about people in his cell (not his roommate) trying to attack him, and was transferred to the segregated housing unit (SHU).

Mr. Kidder was seen by another psychologist on June 1, 2020, for a protective custody review. He was noted not to have reported present mental health complaints. He stated he was presently prescribed the antihistamine hydroxyzine for anxiety, and that this medication was helpful. The defendant provided no specific details regarding his need for protective custody, except to state that someone on his housing unit threatened him.

Mr. Kidder returned to his previous housing unit on June 3, 2020. Subsequently, his evaluation was re-assigned to this examiner due to the other psychologist's extended absence. He was therefore seen for initial interview by this examiner on June 22, 2020. During that interview, Mr. Kidder was cooperative, serious, and formal in presentation. He appeared anxious. He stated he had previously been told by a doctor that he had schizophrenia, but asked earnestly, "Is it possible there could be a misdiagnosis? That the hospital could be wrong?" He then explained that he had spoken with other inmates about typical symptoms of schizophrenia (e.g., auditory or visual hallucinations), and that he does not have those symptoms. He stated his belief that he received his diagnosis because of his belief he was a saint or higher-level being. He asserted these beliefs were "something religious between me and God," but had nothing to do with a mental illness. When asked about the information he reported at the time he requested protective custody, the defendant stated he had a "problem" with an inmate who was housed across from his cell. He said the inmate told him "bad things" would happen to him if he did not give him a certain amount of commissary items every two weeks. He stated his cell mate assured him he would get him removed from the unit to help him avoid this problem. Accordingly, Mr. Kidder said his cell mate "started saying, 'He sees voices'…but it wasn't true." He asserted he was experiencing no mental health symptoms at all.

During each interview, Mr. Kidder was formal and serious but appeared very nervous. He expressed great concern about the possibility that the conversation could be overheard by other inmates, particularly when making any reference to his current charges. During the initial interview, when asked to identify the charges he is facing, the defendant asked if he could write down his response. He was provided a piece of paper and proceeded to do so. He also opted to write responses to select questions during other interviews. During one interview in a private office upstairs from a noisy inmate population (as some inmates were outside of their cells, talking, exercising, and watching television), Mr. Kidder repeatedly peered out the window behind him before responding. At one point, this examiner asked him to step outside of the office due to an incoming phone call. He complied, and after the call ended and he returned, he continued to appear nervous and look over his shoulder before responding to sensitive questions. When advised inmates on the floor below could not hear a private conversation in the office, Mr. Kidder asserted he had heard this examiner's telephone conversation a few minutes prior. However, he admitted he was standing just outside the door in an effort to determine whether anyone could hear what was being said in the office. The difference between standing immediately outside a door and being on another level amidst loud noise was explained, and he appeared to accept this explanation. During one meeting, he wrote down the question, "How often do people with my crime get attacked here?"

FORENSIC EVALUATION - Page 11 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

Following the interview in which the details of the alleged offense behavior were discussed (see the addendum report), Mr. Kidder appeared highly anxious, stating he hoped no one heard the discussion, because if they did, he would likely be attacked or killed.

Following the administration of the PAI, Mr. Kidder was given the opportunity to ask any clarifying questions about the test items. During this discussion, he expressed bafflement at certain topics, mostly related to emotions and relationships. For example, regarding a question that referred to a "relationship with [a] spouse or partner," he expressed uncertainty at what "spouse or partner" meant. When the concept was explained, he said, "Oh, I don't do that." Additionally, he expressed confusion about three other relationship-oriented items. Mr. Kidder also asked about the meaning of the terms, "anxious or tense" and "weak stomach."

Due to modified operations initiated in March 2020 due to the COVID-19 pandemic, Mr. Kidder (along with the rest of the inmate population) was largely on cell restriction status for most of the evaluation period. That is, his housing unit remained on secured status, such that inmates were only given limited out-of-cell time for showering and access to telephone and e-mail. However, throughout the duration of the evaluation period, Mr. Kidder resided either on the same housing unit where this examiner's office is located, or on units where this examiner conducted routine rounds. Therefore, due to the modified operations in response to COVID-19, this examiner conducted rounds on Mr. Kidder's housing unit several times a week and spoke with him frequently during brief periods out of his cell, offering a unique view into his daily functioning. During these rounds, Mr. Kidder was consistently polite and denied mental health symptoms or concerns. He was provided stress management materials (i.e., puzzles and reading material) to help occupy his mind while in the secure housing status.

Mr. Kidder was able to attend to his day-to-day functioning in an adequate manner. He displayed adequate hygiene and appeared isolative, but free of overt problems with other inmates. He spent most of his time in his cell, reading or writing, and kept in contact with his family when he was able to make calls. Mr. Kidder reported getting along well with all of his cell mates, and he had several different cell mates due to periodic unit changes. The defendant appeared to show no functional impairment throughout his evaluation period. Mr. Kidder received no incident reports during his stay at MCC Chicago. He departed the facility on September 15, 2020.

A select sample of Mr. Kidder's telephone calls placed during his detention at MCC Chicago was reviewed for the present evaluation. A total of 52 calls were placed from his account throughout his evaluation period. The reviewed calls were placed to his brother, mother, and father. Overall, his presentation and demeanor was similar to that displayed during the evaluation. Mr. Kidder consistently reported accurate information about his legal status, the nature and timelines associated with his evaluation, and the procedures being implemented at MCC Chicago in response to COVID-19. He often described the conditions as "really bad," and made vague reference to being fearful for his safety. During two reviewed calls to his mother, she and the defendant debated the legitimacy of his schizophrenia diagnosis. Mr. Kidder sounded very encouraged when he recounted a conversation in which one of the psychologists he had seen asked him, "What if I told you you're

FORENSIC EVALUATION - Page 12 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

not schizophrenic?" Mr. Kidder expressed he thought it was "too late" because he had already been
labeled, but that, "If he thinks I'm not, that's great!" He went on to explain that if he did have
"delusions of grandeur," it was a "very mild symptom" and that he does not experience
hallucinations. During a call with his brother, Mr. Kidder expressed concern that the prosecutor
was trying to "send [him] to a nut house." He reiterated during multiple calls that he thought the
prosecutor was trying to make him look like "an absolute nutcase, like I'm gonna go shoot up a
building or something." In one call with his mother, Mr. Kidder articulated his thoughts about his
diagnosis as follows: "Outside of religion, I don't have delusions of grandeur, so I mean, that could
just simply be a religious belief and not schizophrenia. The doctor that I was speaking with at the
hospital could have been an atheist." During that same call, they discussed his childhood label as
"emotionally disturbed," and Mrs. Kidder stated that his father did not "believe in" counseling or
psychiatrists. Mr. Kidder remarked, "I agree with that, I don't believe in any of that garbage."
During several conversations, he expressed fear that if he was diagnosed with schizophrenia during
the present evaluation, or if the present evaluation did not "trump" his previous one, he might be
forced to take medication. His mother assured him several times that he would not be forced unless
he was a danger to himself or others, and she stated she would look into herbal supplements to treat
schizophrenia if necessary. Mr. Kidder did not send any e-mails from his account for the duration
of his evaluation period.

**Mental Status:** Mr. Kidder was consistently alert and oriented to time, place, person, and situation.
His demeanor was cooperative, formal, and serious. His mood was consistently described as
"good." Affect was blunted, with a very limited range of expression. Thought processes were
rational, relevant, coherent, and free of loose associations or tangentiality. He was religiously
preoccupied and made frequent references to his belief that he is a higher-level being, but no
grandiosity or other delusional beliefs were observed outside of his religious ideation. Speech was
unremarkable in rate, tone, volume, and prosody. Suicidal and homicidal ideation, intention, and
plan were consistently denied. Perceptual disturbances were denied, and at no point did he appear
to be attending to internal stimuli. Motor behavior was unremarkable. Remote, recent, and
immediate memory appeared intact. Insight and judgment appeared intact.

**Medical and Psychiatric Evaluation, Studies, and Treatment:** Mr. Kidder arrived at MCC
Chicago on May 8, 2020. Based on the BOP COVID-19 protocol, he was placed in a 14-day
quarantine unit on arrival. He was seen for an intake health screen on May 8, 2020. A history of
mitral valve prolapse was noted. His recent mental health diagnosis and hospitalization were noted.
He arrived with a prescription for the non-formulary antihistamine hydroxyzine from the county
jail, but with no collateral records. A request was submitted to continue the medication during his
evaluation, as non-formulary medications require approval. On May 11, 2020, Mr. Kidder's
prescription was changed from hydroxyzine 50 mg twice daily to 50 mg in the evenings. A routine
history and physical examination was conducted on May 20, 2020.

During his quarantine period, temperature and symptom checks were conducted, and Mr. Kidder
tested negative for COVID-19 on May 26, 2020. He was cleared for general population on May 29,
2020. The defendant had no further contacts with medical staff for health complaints or concerns

FORENSIC EVALUATION - Page 13 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

until September 1, 2020, when he complained of dental pain. He was seen the following day by the dentist, and was noted to have dental caries (cavities) and lower wisdom tooth occlusion. Due to equipment damage from a flood in the dental area, there was no equipment to perform extractions. Analgesic treatment was utilized in the interim; Mr. Kidder was prescribed Naproxen (500 mg twice daily as needed for pain).

**Psychological Test Results:**  The PAI was administered as an objective personality measure to assess clinical symptoms and concerns. An informal assessment of Mr. Kidder's ability to read and understand the test items was conducted by asking the defendant to read the first several items aloud and paraphrase their meaning. Mr. Kidder was able to decode and comprehend the items without difficulty. He appeared to maintain adequate focus and motivation during test administration. He appeared to take testing very seriously, laboring over test items and taking somewhat longer than usual to complete the test. Because of this approach to testing and due to time constraints, the PAI was administered across two separate sessions.

Mr. Kidder's PAI validity scale scores suggest he attended appropriately to test items, and responded consistently to similar items. However, there are indications that he tended to present himself in a consistently favorable light, and as being relatively free of common shortcomings to which most people will admit. He appears reluctant to acknowledge personal limitations, and tends to repress or deny distress or other problems that might arise from those limitations. Mr. Kidder may minimize, or possibly be unaware of, problems or other areas of less-than-optimal functioning. Therefore, the PAI profile may underrepresent the extent and degree of any significant findings. In addition, the possibility of denial of problems with drinking and drug use should be considered, as people with his response style may attempt to minimize the impairment that results from such problems. Despite the level of defensiveness observed in Mr. Kidder's response style, there are some areas in which he described problems of greater intensity than is typical of defensive respondents. These areas include impaired empathy, frequent routine physical complaints, and inflated self-esteem.

The PAI clinical profile showed no elevations that would indicate the presence of clinical psychopathology. The PAI clinical profile is entirely within normal limits. However, some denial or defensiveness is likely to be responsible for the generally trouble-free picture that he is reporting, as he appears to be reluctant to admit to dysfunction or problems across many areas.

Mr. Kidder's self-concept appears to be generally stable and positive. He described himself as a normally confident and optimistic person who approaches life with a clear sense of purpose and distinct convictions. He also described himself as being reasonably self-satisfied, with a well-articulated sense of who he is and what his goals are. Interpersonally, Mr. Kidder's PAI profile characterized him as valuing harmonious relationships and deriving much of his satisfaction from such relationships. He is therefore likely to be uncomfortable with interpersonal confrontation or conflict, and he may tend to shun controversy. He is likely quick to forgive others and give them a second chance. The defendant reported experiencing an average level of life stress, and a large number of supportive relationships that can buffer against the effects of this stress.

FORENSIC EVALUATION - Page 14 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

The defendant reported a substantially lower level of interest in and motivation for treatment compared to people who are seen in treatment settings. Given his possible denial of problems or defensiveness, it is likely that he is either not experiencing sufficient distress to feel that treatment is warranted, or he may be reluctant to discuss personal problems.

The Shipley-2 was administered as a brief measure of cognitive functioning and impairment. Mr. Kidder approached testing with focus and a high level of apparent effort.

Mr. Kidder obtained a Shipley-2 Composite score of 95, which falls into the "Average" range of overall cognitive functioning and falls in the 37th percentile. This score means that 37% of individuals Mr. Kidder's age on which this test was normed achieved scores equal to or below his score. There was no significant difference between Mr. Kidder's verbal and nonverbal performance on this test, suggesting these abilities are about equally developed. Mr. Kidder achieved a Vocabulary Standard Score of 95, which fell in the 37th percentile and in the "Average" range. This subscale measures crystallized ability, or knowledge that is gained as a result of education and experience. Mr. Kidder also obtained an Abstraction Standard Score of 101, which also fell in the "Average" range of functioning and the 53rd percentile. This subscale measures fluid cognitive ability, such as the ability to use logic and other skills to learn and acquire new information. Based on Mr. Kidder's observed verbal fluency and reasoning abilities, these scores are judged to be a reasonable estimate of his intellectual functioning.

## CLINICAL FORMULATION:

Mr. Kidder is a 36-year-old man who has a longstanding history of socially unconventional behavior and limited social engagement with others. It appears that he developed religious preoccupation as an adolescent, and that his beliefs have evolved over time to assertions that he is a higher-level being or saint. His beliefs have also incorporated alien themes, and he has accumulated a significant arsenal of firearms. Despite behaviors and beliefs that appear bizarre to others, the defendant appears to experience little distress regarding any of the things that seem to bother those around him. His interpersonal style, at least according to one individual, has impacted his work.

At this time, none of the diagnostic criteria for Schizophrenia are met by the defendant. He does not exhibit hallucinations, disorganized speech or behavior, or negative symptoms. Although his grandiose beliefs are unusual, they appear exclusively rooted in his religious beliefs, and there has been no observable grandiosity outside of those beliefs during the evaluation period. They did not appear inflexible, and he appeared to modify them with feedback. Moreover, they do not appear to impact his current functioning. That is, he was able to interact appropriately with other inmates without referencing them, and they do not particularly appear to dictate his behavior. A more fitting explanation for Mr. Kidder's symptom presentation falls in the category of characterological, personality disorders, which are pervasive and consist of maladaptive traits that have been incorporated into an individual's personality.

FORENSIC EVALUATION - Page 15 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

Schizotypal Personality Disorder is defined in the *Diagnostic and Statistical Manual of Mental Disorders—Fifth Edition (DSM-5)* as a pervasive pattern of social and interpersonal deficits marked by acute discomfort with, and reduced capacity for, close relationships as well as by cognitive or perceptual distortions and eccentricities of behavior. Mr. Kidder meets diagnostic criteria for this disorder, based on the presence of ideas of reference; odd beliefs or magical thinking; unusual perceptual experiences; suspiciousness; constricted affect; behavior or appearance that is odd, eccentric, or peculiar; and lack of close friends or confidants other than first-degree relatives.

The defendant reported a history of a significant traumatic loss (i.e., the loss of his brother) and subsequent perceived trauma that was caused by voluntary viewing of disturbing violent content. He did not report or display symptoms that would meet criteria for a diagnosis of Posttraumatic Stress Disorder or any other trauma-related disorder. However, the impact of these events on his functioning may be a subject for future evaluation.

Mr. Kidder's current charges are suggestive of a pattern of sexual interest in children. There is at least one (albeit second-hand) collateral report of his disclosing to a peer that he had preferential interest in children under 12. He admitted to investigators that he masturbated to the images he viewed of child pornography with infant to prepubescent children, and he disclosed to this examiner that he viewed such images, along with other content, for several years (see addendum). A diagnosis of Pedophilic Disorder requires a pattern of recurrent (over a period of six months or greater), intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activity with a prepubescent child or children (generally age 13 years or younger). Because the defendant did not admit to preferential interest in children during the present evaluation, and because the charges at this time are mere allegations of which he has not yet been convicted, a rule-out diagnosis is offered at this time to reflect the need for further evaluation once the current charges are resolved.

## DIAGNOSTIC IMPRESSIONS:

The following diagnosis is offered in accordance with the criteria set forth in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5):*

> Schizotypal Personality Disorder
> Rule-out Pedophilic Disorder

## PROGNOSIS/TREATMENT RECOMMENDATIONS:

The defendant's personality features are pervasive and characterological, and are unlikely to significantly change in the near future. He is not currently taking any psychotropic medication, and has maintained stable functioning. Therefore, his prognosis for psychological stability is good. It is recommended that Mr. Kidder engage in individual therapy, if he is willing, to help him manage the distress he said he has experienced related to his traumatic or disturbing experiences. This therapy

FORENSIC EVALUATION - Page 16 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

may also focus on increasing appropriate social relationships and experiences. The recommended intervention is available both in the community and in the Bureau of Prisons.

## DISCUSSION AND OPINION REGARDING COMPETENCY TO PROCEED:

The standard for competency to stand trial consists of both a factual and rational understanding of the nature and consequences of court proceedings, as well as the ability to assist in one's own defense. On arrival at MCC Chicago, Mr. Kidder was aware he had been referred for evaluation. He specified that he was told that because he had been diagnosed with schizophrenia, he would be getting an evaluation.

Collateral contact with the defendant's attorney, Mr. Saraceno, identified his primary concern about Mr. Kidder's competency as the defendant's belief that he is a "supreme being." He described the defendant as "very out of touch with reality," and when asked if these beliefs interfered with case-related discussions, he replied affirmatively.

The Revised CAI was administered as a semi-structured interview to assess competency-related abilities. The interview assesses areas that include, but are not limited to, a defendant's understanding of his or her charges, understanding of the roles and functions of various courtroom participants, understanding of court procedures, ability to cooperate rationally with counsel, and capacity to engage meaningfully and appropriately in the court proceedings. Mr. Kidder was engaged and focused on the interview, and responded relevantly to questions.

Mr. Kidder initially stated his charge is an "internet crime," cautiously looking around to seemingly ensure no other inmates could hear him. He chose to write his response, that he "went on the Internet and downloaded child pornography." He knew the difference between felony and misdemeanor charges, correctly identifying his current charges as felonies. Mr. Kidder was generally aware of the potential penalties associated with this charge, stating he thought there was a "mandatory minimum of five years, at least in New York." He was educated about the difference between federal and state charges, and he was able to intelligently discuss this topic and learn the information. He explained his first attorney, Mr. Zosh, told him about the mandatory minimum. Mr. Kidder stated he has never been on probation before, and thought probation was "like house arrest or something? Like an ankle bracelet?" He guessed if he were on probation, he might be prohibited from using the Internet, and would be required to check in with a probation officer and possibly be required to attend "counseling or something."

In regard to the various available pleas, Mr. Kidder identified the pleas of Not Guilty and Guilty. He accurately described the meanings of each plea and the associated dispositions. For example, he said for a plea of Not Guilty, a defendant is "telling 'em you didn't do this – that you're being falsely accused." He knew the meaning of a defense of Not Guilty by Reason of Insanity (NGRI) and was aware of the usual dispositions of these cases.

FORENSIC EVALUATION - Page 17 of 26
KIDDER, Brandon: Reg. No.: 01435-509
October 13, 2020

Mr. Kidder demonstrated awareness of the adversarial nature of court proceedings during the RCAI interview. He accurately described the roles and responsibilities of various court officials, including the prosecutor, judge, and witnesses. For example, he described the role of a defense attorney as to "help...defend me in court." He stated the role of a judge is "to hand out judgment for my crime." Although he knew the general function of a jury, Mr. Kidder was able to learn and retain additional information about the specific decisions juries are required to make.

When discussing general court procedures, Mr. Kidder showed adequate understanding of the process of direct and cross-examination. For example, he said that during cross-examination, the prosecutor is "trying to get me more time" and get him to say "anything that could get me in more trouble." He knew and articulated the difference between a bench and jury trial, and was able to articulately discuss potential reasons a defendant might choose one over the other. Mr. Kidder demonstrated basic understanding of his right to avoid self-incrimination.

Mr. Kidder displayed motivation to help himself in the legal process, and was able to discuss his desired outcome. He displayed a realistic appraisal of the likely outcome of his case. He understood the concept of evidence and discussed examples of evidence for or against a defendant. He demonstrated good ability to apply this concept to his case. Mr. Kidder correctly discussed the concept of a plea bargain; he said there was one offered in his case, but his mother said it was "outrageous" and refused to tell him what was offered. He was unsure which rights are forfeited by a defendant in order to accept a plea bargain, but he was able to learn and retain this information over a time delay.

Mr. Kidder knew that he has an attorney, and correctly stated his first name. He stated his father just hired a new attorney for him because he "didn't think the old attorney knew about the subject." The defendant said he has not yet spoken to his new attorney; although he was present at his last court appearance, he never got the chance to discuss anything with him. Mr. Kidder stated he had one conversation with his first attorney, Mr. Zosh. The defendant said despite his lack of contact with Mr. Saraceno, he has confidence in him because "my dad says he's the best around." Mr. Kidder was able to describe relevant ways he can help his attorney, such as "communicate honestly" with him. He understood the concept of attorney-client confidentiality. Mr. Kidder was aware of the need to communicate with counsel in the event of disagreement, inaccurate testimony, or need for clarification in court, and stated his willingness to do so.

Mr. Kidder displayed good understanding of appropriate behavior in the courtroom, stating that a defendant is expected to be "quiet" in court. He knew that a defendant could get into trouble if he or she exhibited disruptive behavior in court. When asked if he ever had difficulty behaving appropriately in court, Mr. Kidder said he was once admonished for saying "hi" to his mother when he entered the courtroom. He said after the admonishment, "I didn't say anything after that – I just – zip!" while making a gesture that appeared as though he was "zipping" his lips. During another portion of the interview, Mr. Kidder made it clear he had no intention of speaking to his attorney during court. When asked, for example, how he could communicate time-sensitive information during a trial, he suggested he could "slip him a little note or something." When advised he could

FORENSIC EVALUATION - Page 18 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

potentially lean in and speak quietly to his attorney, Mr. Kidder asked earnestly, "So the officer isn't gonna get mad at me if I talk to my attorney?"

When asked if he believes he has a mental illness, the defendant replied, "Absolutely not. I believe I'm thinking very clearly. People think because I'm religious, I'm wacky." He expressed his intention to continue without taking medication while awaiting trial.

In describing the circumstances surrounding the alleged offenses, Mr. Kidder was able to provide a cohesive narrative of events. He was able to coherently describe his movements, timing, and mental state around the times of the alleged offenses. This discussion suggests the ability to testify relevantly in his case, should he choose to do so.

In sum, Mr. Kidder displayed adequate factual understanding of court procedures, and was able to learn and retain new information of which he was previously unfamiliar. He also demonstrated a rational understanding of these procedures, showing the ability to apply the concepts relevantly to his case. Finally, he appears to currently possess the capacity to cooperate with counsel. Based on the totality of these findings, it is the opinion of the undersigned that Mr. Kidder does not presently meet criteria for a mental disease or defect that would impair his ability to understand the nature and consequences of the proceedings against him, or to assist properly in his defense. Consequently, it is the opinion of the undersigned that Mr. Kidder is competent to proceed at this time.


Robin Watkins, Ph.D., ABPP
Board Certified Forensic Psychologist
American Board of Professional Psychology #8160

**U.S. Department of Justice**

FORENSIC EVALUATION - Page 19 of 26
KIDDER, Brandon: Reg. No.: 01435-509
October 13, 2020

Federal Bureau of Prisons

*Metropolitan Correctional Center*

*71 W. Van Buren Street*
*Chicago, IL 60605*

## FORENSIC EVALUATION ADDENDUM

**NAME: KIDDER, Brandon**
**REGISTER NUMBER: 01435-509**
**DATE OF BIRTH: June 16, 1984**
**DOCKET NUMBER: 20-mj-1010**
**DATES OF EVALUATION: June 3 to August 31, 2020**
**DATE OF REPORT: October 13, 2020**

### IDENTIFYING INFORMATION AND REASON FOR REFERRAL:

Mr. Brandon Kidder is a 36-year-old, Caucasian man who was referred for competency and criminal responsibility evaluation by the Honorable Jeremiah J. McCarthy of the United States District Court for the Western District of New York. Mr. Kidder has been charged in that jurisdiction with Sexual Exploitation of Minors and Activities Relating to Material Containing Child Pornography, in violation of Title 18, U.S.C., §§ 2252A(a)(5)(B), 2252A(b)(2), and 2252A(a)(2)(A). The referring Court has requested that the evaluation include an opinion concerning Mr. Kidder's competency to proceed on these charges, as well as his mental state at the time of the alleged offense. The present evaluation was conducted under the provisions of Title 18, U.S.C., §§ 4241, 4242, and 4247. Mr. Kidder is represented in this case by Dominic Saraceno, and formerly by Michael R. Zosh. The Assistant United States Attorney (AUSA) assigned to the case is Caitlin M. Higgins. This addendum only addresses the defendant's criminal responsibility. It does not constitute a complete report of the evaluation, and should be read in conjunction with the accompanying report that addresses his competency to proceed.

### NOTIFICATION:

The defendant arrived at the Metropolitan Correctional Center (MCC), Chicago, Illinois, on May 8, 2020, for forensic evaluation. He underwent a period of quarantine and a re-assignment of evaluator prior to the initial interview with the undersigned psychologist. During that interview, Mr. Kidder was informed of the nature and purpose of the evaluation. He was further informed that any information he provided in interviews or test responses, any of his statements or actions while at this facility, and any other information obtained about him would be subject to inclusion in a report that would be prepared and submitted to the Court. Mr. Kidder was informed that this written report summarizing the evaluation findings would be provided to the Court, the defense attorney, and the prosecuting attorney. He was told that this report could be used during any phase of his legal proceedings, and that this examiner could be called to testify regarding the report and

FORENSIC EVALUATION - Page 20 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

the data that informed the conclusions contained therein. Mr. Kidder expressed understanding of this information, was able to paraphrase it in his own words, and agreed to participate given the parameters described above. He signed the Statement of Understanding summarizing this information.

## ASSESSMENT PROCEDURES:

The present evaluation was conducted at MCC Chicago. Throughout the evaluation period, Mr. Kidder was routinely observed on his housing unit by correctional and psychology staff. A routine medical history and physical examination was conducted. Mr. Kidder was clinically interviewed and assessed by the undersigned psychologist over multiple formal meetings, as well as numerous briefer and informal contacts, throughout the evaluation period. The Rogers Criminal Responsibility Assessment Scale (R-CRAS) was utilized as a guide in the assessment of Mr. Kidder's criminal responsibility.

## COLLATERAL SOURCES' ACCOUNTS OF THE ALLEGED OFFENSES:

Investigative records indicate that an FBI investigation was opened on December 20, 2019, targeting users of multiple Tor hidden service sites, including one called, "Hurt Meh." The site was noted not to be accessible through the traditional internet; only a user who had installed the appropriate Tor ("The Onion Router," a computer network designed specifically to facilitate anonymous communication over the Internet) software on the user's computer could access the website. Moreover, users must find the 16-character web address in order to access the website, and must create an account in order to access the majority of the material. Users interested in accessing child exploitation material tend to use directory sites that advertise the web addresses of hidden services containing this content. That is, hidden service websites are not "indexed" by search engines (e.g., Google) to anywhere near the same degree as those operating on the open internet. The target site, "Hurt Meh," was identified as an online bulletin board dedicated to the advertisement and distribution of child pornography. The site's page included the following text: "This website was created to host videos, photos and discussions of 18 (twinks) and younger of Hurtcore materials (videos & pictures) as well as discussion of such." The site defined "Hurtcore" content as "rape, fighting, wrestling, bondage, spanking, pain, mutilation, gore, dead bodies, and etc. (no limits)…" Sections and forums for posting to the website included sections for "HURTCORE" content depicting toddlers ages 0-5, children ages 6-13, and teens ages 14+; as well as "GORE/DEATH" including the same three age groups. Investigators reviewed the content of these sections, providing descriptive examples of images and videos depicting child pornography with newborn and one-year-old victims, which involved gore, torture, and sometimes death. An Affidavit states that because accessing this website "required numerous affirmative steps by the user…it is extremely unlikely that any user could simply stumble upon (the website) without understanding its purpose and content." In addition, an FBI review of user data on a similar website determined that it was "exceedingly rare" (i.e., less than 0.02 percent) for a registered site user to access that site and never return.

FORENSIC EVALUATION - Page 21 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

Investigative records indicate that the FBI had received information in August 2019, from a foreign law enforcement agency which had identified an IP address of a user who accessed the "Hurt Meh" site. On September 10, 2019, a subpoena was issued to Charter Communications to determine the subscriber information. The address was linked to "Jeremey Kidder" at a duplex residence in Alden, New York, and additional residents were identified as Scott Taylor, Shane Pagano, and the defendant. A National Center for Missing and Exploited Children (NCMEC) database search revealed a technical assistance report from 2015 which identified Mr. Kidder as a user of a file sharing website called lumfile.com, believed to mainly contain child pornography.

On January 24, 2020, a warrant was signed, authorizing a search of that residence. On January 28, 2020, the FBI executed the search warrant. Shane Pagano, Mr. Kidder's roommate, was interviewed. He stated he had lived at the residence for one year with the defendant, and that another roommate, Joseph Zerby, had lived there for a few months. Mr. Pagano was a sales manager at Majestic Pools. He stated Mr. Kidder "never leaves his bedroom," that he was a gun collector, and "very opinionated about life in general." He stated he had never used Tor, nor had he viewed child pornography. He said he had never seen Mr. Kidder viewing child pornography.

Mr. Kidder was also interviewed on January 28, 2020, and he said for the past few years he had been "messing around on the dark net." Mr. Kidder admitted to viewing adult pornography through legitimate ".com" websites, and stated several years ago, he clicked on "pop-ups" and observed child pornography. He stated he downloaded Tor software a few years ago and went to "Silk Road" (a hidden website designed to enable users to buy and sell illegal drugs and other unlawful goods) to look at guns being sold. He denied engaging in any transactions. Mr. Kidder said he downloaded Tor to his computer and phone, and used Tor to download file packets from various sites, including child pornography. He stated he last downloaded a large file (multiple Gigabytes in size) containing adult and child pornography from Tor about a week before the warrant's execution. When asked if he was familiar with "Hurt Meh," Mr. Kidder said he was familiar with "HurtMehPlenty," where he saw videos of animals being tortured and hurt. He stated it also had images and videos of child rape, videos from war, and a male being decapitated. Mr. Kidder said he obtains the child pornography out of curiosity, but also masturbates to it. He stated he is not homosexual, has no interest in having a girlfriend, and that he is a virgin. He stated he has never touched a child in an inappropriate manner, and currently has no access to children. Mr. Kidder admitted having downloaded several large files containing child pornography in the past, said he kept the files, and said he "occasionally" masturbates to the child pornography. Mr. Kidder also admitted to possessing four long guns which were in his bedroom. He voluntarily turned those guns over to his brother. At the conclusion of the interview, he signed a statement of fact regarding what was discussed.

The FBI seized two smartphones, a desktop computer, a laptop computer, and two thumb drives. Relevant findings included a video showing a baby approximately six months to one year old, sitting nude on top of a naked adult male facing away from the camera. The adult rubbed his erect penis against the baby's anus and struggled to penetrate it; he then placed his thumb into the anus while holding his penis. He then penetrated the baby's anus with his penis and feces was released

FORENSIC EVALUATION - Page 22 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

onto the penis. The man ejaculated, and the baby was screaming throughout the video. Another image showed a man lying on his back with an approximately two-year-old toddler sitting nude with her vagina on top of the man's erect penis, which was not penetrating her vagina. She had a condom in her hands and there appeared to be semen on her torso. Other images included an approximately one-year-old female baby with a penis inserted into her anus and an adult hand holding her labia open, exposing her vagina; and an approximately six-year-old girl sitting on the floor wearing no pants, with her legs spread, exposing her vagina. Finally, three images of the same newborn female baby were found; this baby's umbilical stump recently fell off, suggesting she was only one or two weeks old. One image showed the baby with an erect penis in her mouth; one showed her vagina exposed and semen on her vagina and torso, and her anus appearing red; and one showed the baby crying with semen on her body.

On February 10, 2020, FBI agents received a call from Darryl O'Shei, New York State Police Trooper, to discuss the defendant. He stated he was a family friend of Shane Pagano's, and also knows both Jeremy and Brandon Kidder pretty well. Both Kidders were formerly employed at Majestic Pools; the defendant had to work in the warehouse due to the Nazi rhetoric described in the accompanying report. Mr. O'Shei said that Mr. Pagano had told him he would occasionally have a girlfriend over, and Mr. Kidder would tell her, "Don't speak to me." The defendant reportedly told Mr. Pagano that he liked girls "12 and under," and did not like that he could not "train" an older girl. Following the search warrant, Jeremy Kidder bought the defendant a "burner phone" so he had a device. The defendant was no longer staying at the residence; about a week prior, he had shaved his head, facial hair, and eye brows, before leaving the house in a trench coat. Mr. Pagano reportedly told Mr. O'Shei he thought it was an effort to look more like a skinhead, and that he was unsure where the defendant was. Mr. O'Shei was aware that Mr. Kidder's mother took him for a mental health evaluation.

Later that day, agents called Mr. Pagano, who agreed with the details provided by Mr. O'Shei. He confirmed he observed Mr. Kidder with his head and facial hair shaved about 24 hours before he went to the hospital. He stated he thought Mr. Kidder's family was now trying to get him the mental health services he needs. He said they all knew there was some issue, but did not understand the seriousness. Mr. Pagano stated Mr. Kidder often said he hated black people or gay people, among other groups, but Mr. Pagano thought that was just an attempt to shock others.

The following day, Mr. Zosh (the defendant's attorney at the time) called to advise that Mr. Kidder had been voluntarily admitted to the hospital a few days ago. He inquired about the possibility of criminal charges and whether self-surrender was a possibility.

On March 5, 2020, Judge McCarthy signed a warrant for the defendant's arrest. The next day, arrangements were made for Jeremy Kidder to meet FBI agents with the defendant at a local café. He was placed into custody without incident.

Sensitive – Limited Official Use

FORENSIC EVALUATION - Page 23 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

## DEFENDANT'S ACCOUNT OF THE ALLEGED OFFENSES:

According to Mr. Kidder, through his online gaming, he talked with friends who were talking about the dark web. He said he learned about the Tor browser, which someone told him prevented illegal activity from being tracked. He said the dark web "seemed like this amazing thing." He stated he became curious and "finally overcame my curiosity to see what it was." He said he "found a way on there" by downloading Tor. He initially stated he "stumbled upon some bad websites and clicked 'download.'"

During the initial interview, when asked about his current charges, Mr. Kidder chose to write down his response for fear of being overheard by other inmates. He wrote, "I was playing video games 1 day people were talking about the dark net and curiosity got a hold of me and I downloaded very bad stuff Child Porn."

Regarding his intentions when entering the dark web, Mr. Kidder stated he wanted to obtain movies, but mainly, he said, "I have an obsession with aliens, religion, and finding out secret government files." He said he downloaded a file called the "X Files," thinking it would contain material proving the existence of aliens (because of its similarity to the title of a television show about aliens), possibly government files that had been hidden from the public. He said he downloaded "Part 1," which was about 5 gigabytes of material in a zipped or compressed file. He said there were a total of 20 or 30 compressed files of comparable size, and he downloaded them all. He said, "That's when I started seeing things that are…I found a lot of bad stuff on there." He admitted that child pornography was part of it, but that he also saw a variety of other horrific material. For example, he saw someone getting his head cut off, someone digging up a body and having sex with it, "brutality" including rapes of both live and dead people, people having sex with animals, and a video of an "Asian woman stepping on a kitten, crushing the kitten for no reason." He also described watching a video of two women on their knees, crying, before one was shot in the head and the other was decapitated with a machete.

Mr. Kidder stated that when he first started viewing the material, he felt "pretty sickened – grossed out." However, he said he continued to view the material out of curiosity. He emphasized that there are still a lot of files within each "part" that he has not viewed, due to the sheer volume. He stated he deleted the ones he viewed, including "murder, rape videos, animal cruelty – I'm not into that stuff." When asked which files he did not feel "sickened" to watch, he said, "Movies like Napoleon Dynamite, music," before acknowledging he did watch "regular (adult) porn." He said there were some pictures of naked adolescent girls which he thought were "very pretty." He added that when someone leaves high school, sexual attraction to high-school-aged girls "doesn't just go away." When asked about the specific infant theme identified by agents, Mr. Kidder replied, "There's a lot of that on there. Every file that I downloaded had some form of it on there." When this examiner referenced a description in investigative records of one of the videos, Mr. Kidder stated, "There's a lot of that stuff. What they have on my computer is nowhere near" what he has viewed in total. However, he said he did not specifically recall the examples listed in the Criminal Complaint, stating, "Those are probably the worst ones that I hadn't [viewed or] deleted yet."

Sensitive – Limited Official Use

FORENSIC EVALUATION - Page 24 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

The defendant stated he continued to view "Hurtcore" videos despite being disturbed by the violence depicted in them. He said he continued this viewing over a long period because of "curiosity of what was happening in the world. outside of Alden – what people are capable of doing to others. I could never do that – I can't even go hunting." He described feeling he has been permanently mentally changed by what he has seen, stating, "Before, everything was peaceful, happy – now, it seems like everywhere I look, there's brutal people out there...You wouldn't believe some of the things I've seen on there." He described his ongoing consumption of the material as "facing my fears." Mr. Kidder said he deleted one video about halfway through because of how disturbing it was (i.e., people being "hacked up with a machete"), but that he viewed most of the material he opened in its entirety. He said he tended to "watch and delete" the "brutal ones."

Regarding his sexual interest in the material, Mr. Kidder said he was aroused primarily to teen nudity. He denied arousal to any infant, toddler, or prepubescent material, or to images of brutality or rape. He said. "Some that I found attractive probably weren't exactly 18," estimating they might be around 14. He said, "I'm not going to lie – even though I want to die a virgin," he was aroused by some of the pornographic material. Mr. Kidder stated he kept and "set aside" material with girls ages 13 to 19. He stated he was "disgusted" by the material including child pornography and brutality toward young children. He said, "I've seen worse than they're describing here," and began to describe an example but then stated he did not want to talk about it. He said he deleted that video as soon as he saw it.

Despite the nature of the material he viewed, Mr. Kidder continued to assert he was primarily "curious" and "driven to find secret government files that would show me whether aliens exist." He stated he thought he found some evidence in a particular image of a young girl with hands that were "shaped weird." He stopped momentarily to ask, "I'm not gonna get erased by the government for viewing this, am I?" Mr. Kidder said seeking proof of aliens was his "original reason," and that he knew he could get in "serious trouble" if he found evidence of aliens.

Within and across interviews, Mr. Kidder frequently repeated the same phrases about the alleged offenses. With some variation, he stated, "It was a very bad mistake. I wish I'd never found out about [the dark web]. I've never been in trouble in my life – never even a speeding ticket...It was the first mistake of my life, the worst mistake of my life. [I got curious and] curiosity killed the cat. It's never gonna happen again. that's for sure."

Mr. Kidder emphatically stated, "I knew what I was doing was wrong – I'm not gonna try to blame anyone but myself." At another point, he stated, "I downloaded it fully knowing what I was doing. There was a lot of bad stuff on there – I knew that." He stated that although he knew he could get in trouble, he did not realize until later that he could be "killed for it" (i.e., by other inmates who were hostile toward sex offenders).

The defendant said he remembered his interview with FBI agents "very clearly." He said they advised him his Internet company "tipped them off that I was downloading bad stuff." He stated he was "100% honest" with the agents because they told him "honesty goes a long way."

FORENSIC EVALUATION - Page 25 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

Regarding his mental state around the time of the alleged offenses, Mr. Kidder stated that over the years he was on the dark web, he was unemployed but occasionally worked "side jobs" where he helped his brother clean houses his brother had purchased. Mostly, Mr. Kidder said, he spent his time "playing video games a lot." He said he was "so into video games" that he became "immersed." He sometimes stayed up all night and felt the games "put [him] into another world." He said he also sometimes watched movies with his roommates and went target shooting. Emotionally, Mr. Kidder described himself as "pretty happy" around the time of the alleged offenses. He said, "I had cheap bills, I did stuff I like to do, I didn't seek romantic relationships, I devoted my life to God." He denied experiencing any hallucinations around that time. He further denied disturbance of mood or delusional thinking. While his religious beliefs may be identified by some to be evidence of delusional thinking, Mr. Kidder did not report any beliefs or ideation at the time of the alleged offenses that would be consistent with delusions.

## OPINION REGARDING THE DEFENDANT'S MENTAL STATE AT THE TIME OF THE ALLEGED OFFENSE:

The standard for insanity is set forth in Title 18, U.S.C., § 17, of the Federal Criminal Code and Rules, which states:

> It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

The R-CRAS is a structured decision model for evaluating criminal responsibility, which was utilized as a guide in assessing Mr. Kidder's sanity at the time of the alleged offenses. The domains on this instrument, as applied to the defendant, are indicative of criminal responsibility at the time of the alleged offenses.

Mr. Kidder's self-reported version of events was consistent across interviews and with his interview statements noted in collateral sources. There is no evidence of brain damage or disease that would interfere with Mr. Kidder's reliability, or that would relate to the alleged offenses. There were no reports of observable bizarre behavior at the time of the alleged offenses. There appeared to be significant planning involved in the alleged offense behavior, including downloading the Tor browser on multiple devices and taking multiple steps to access the websites where he found child pornography.

The defendant's reported and self-described behavior were highly consistent with an awareness of the wrongfulness or criminality of his actions. For example, he appears to have taken measures to conceal his activities, as he stated he did not tell his roommates about it, and they did not appear to be aware of it. During his statement to authorities, he made potentially self-protective statements (e.g., he stated he "lost" a thumb drive containing child pornography and described the child pornography as just part of a larger foundation of files). These behaviors suggest he understood he

FORENSIC EVALUATION - Page 26 of 26
KIDDER, Brandon; Reg. No.: 01435-509
October 13, 2020

could be apprehended and charged for his actions.  Moreover, Mr. Kidder explicitly stated on multiple occasions during the present evaluation that he was fully aware of the wrongfulness and criminality of his actions.

Finally, despite the presence of a personality disorder, there is no evidence that Mr. Kidder met criteria for an acute mood or psychotic disorder at that time.  Although he described somewhat unconventional beliefs about aliens which could be related to his Schizotypal Personality Disorder, his seeking of evidence of aliens does not appear directly related to the seeking, downloading, viewing, saving, and masturbating to child pornography.

In sum, based on the available information, it is the opinion of the undersigned evaluator that, despite the presence of Schizotypal Personality Disorder, Mr. Kidder was not suffering from a mental disease or defect which would render him unable to appreciate the nature and quality or the wrongfulness of his actions at the time of the alleged offenses.

Robin Watkins, Ph.D., ABPP
Board Certified Forensic Psychologist
American Board of Professional Psychology #8160